# EIN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

ESTATE OF CARL MARTIN, by and through its personal representatives Belynn Guerrero and Terry Martin;
BELYNN GUERRERO, individually; and
TERRY MARTIN, individually,

      Plaintiffs,

v.

ADAMS COUNTY, COLORADO[1];
ADAMS COUNTY SHERIFF GENE CLAPS, in his official capacity;
ADAMS COUNTY BOARD OF COUNTY COMMISSIONERS;
WELLPATH, LLC;
H.I.G. CAPITAL, LLC;
LPN JAMIE LALICKER, in her individual capacity;
LPN SCARLETT MCCURRY, in her individual capacity;
RN KARIE MITCHELL, in her individual capacity;
RN SONYA BARRERA, in her individual capacity
RN AMANDA BECKWITH, in her individual capacity;
LPN ANDREA PASILLAS, in her individual capacity;
MHP MARYANN MARTHA MAGLEY-HERMAN, in her individual capacity;
LPN JANICE MARSHALL, in her individual capacity;
LPN SARA POST, in her individual capacity;
RN AIMEE OLSON, in her individual capacity;
RN ASHLEY SNYDER, in her individual capacity;
LPN JESSICA HAAKESON, in her individual capacity;
DEPUTY CRYSTAL LAW, in her individual capacity;
DEPUTY KAYLA HAMPEL, in her individual capacity;
DEPUTY ALAN BARRY, in his individual capacity;

---

[1] "Adams County, Colorado," is the correct name of the governmental entity Defendant. There is a split of opinion among some judges in this district and elsewhere regarding the proper named defendant when suing a County under Section 1983. Some judges require that plaintiffs name the Board of County Commissioners and/or the sheriff in his/her official capacity to name a Colorado county as a Section 1983 defendant. This is the intent of this civil rights action, to hold the County liable, however denominated. If the Court in this matter ultimately requires Plaintiffs to name as Defendants only the "Board of County Commissioners of Adams County" and/or "Sheriff Gene Claps in his official capacity" to sue Adams County, or some other entity in order to obtain municipal liability against Adams County, Plaintiffs will substitute or voluntarily dismiss parties, and this shall serve as notice of the lawsuit and the factual and legal bases of the claims to those putative County municipality Defendants and their lawyers.

DEPUTY SCOTT FANSELOW, in his individual capacity;
DEPUTY ANDREW VASSALLO, in his individual capacity;
DEPUTY LEE PATTON, in his individual capacity;
DEPUTY BRANDON SKALAK, in his individual capacity; and
DEPUTY YVON BENOIT, in her individual capacity;

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiffs, by and through counsel, Darold Killmer, Liana Orshan, and Maddie Lips of KILLMER LANE, LLP, and Kayla Foley of THE FOLEY LAW FIRM, respectfully allege for their Complaint and Jury Demand as follows:

**I.      INTRODUCTION**

      1.      When twenty-seven-year-old Carl Martin was arrested and brought to Adams County Detention facility ("ACDF") in late March 2022, he exhibited symptoms of severe alcohol withdrawal. Left untreated or inadequately treated, severe alcohol withdrawal can be fatal.

      2.      During his seven-day detention at ACDF, Mr. Martin was never examined by a physician or higher-level provider like a physician assistant or nurse practitioner, and his condition continued to obviously deteriorate. None of the Individual Medical Defendants, who were nurses and other medical providers at ACDF, ever even contacted a higher-level provider for guidance, treatment, or support.

      3.      Individual Medical Defendants allowed the alcohol withdrawal protocol on which Mr. Martin was placed upon admission to lapse, despite the fact that Mr. Martin continued to exhibit very alarming and noticeable symptoms of alcohol withdrawal.

      4.      Mr. Martin stopped drinking sufficient amounts of water as his condition

2

worsened; despite the known risk of dehydration with severe alcohol withdrawal, Individual Medical Defendants did not give him an IV to ensure hydration or take any other steps to address his dehydration.

5.    Many of the Individual Medical Defendants fabricated their records showing when Mr. Martin received medication for withdrawal and assessments, meaning they lied about Mr. Martin receiving even the absolute bare minimum that was necessary for him to improve or survive.

6.    Thus, Mr. Martin arrived at ACDF alert and oriented and became progressively confused and bewildered, suffering obvious hallucinations and gradually losing touch with all reality.

7.    Eventually, on April 5, 2022, after painfully suffering physically and emotionally for seven days in plain view of Defendants, Mr. Martin died on the floor of his cell. If any of the Individual Medical or Deputy Defendants had initiated an appropriate medical intervention on behalf of Mr. Martin, he would be alive today. Defendants' willful and deliberate indifference to Mr. Martin's serious medical needs directly led to his torturous, easily preventable, and unjustifiable death.

8.    Defendants are liable for the death of Mr. Martin under the Fourteenth Amendment to the United States Constitution based on their deliberate indifference to Mr. Martin's obvious and serious medical needs. Defendants are also liable for wrongful death under Colorado state tort law, and the correctional officer Defendants are further liable under Colorado's Enhance Law Enforcement Integrity Act.

## II.    JURISDICTION AND VENUE

9.    This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C.

§ 1331, and this case is brought pursuant to 42 U.S.C. § 1983. Jurisdiction supporting Plaintiffs' claims for attorney fees is conferred by and brought pursuant to 42 U.S.C. § 1988. This Court has jurisdiction over Plaintiffs' state claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State of Colorado at all relevant times stated herein.

## III.     PARTIES

**Plaintiffs**

11.     At all times relevant to the subject matter of this litigation, the decedent, Carl Martin, was a citizen of the United States of America and a resident of and domiciled in the State of Colorado. At all relevant times after his passing, Belynn Guerrero and Terry Martin were the co-personal representatives of the Estate of Carl Martin.

12.     Plaintiff Belynn Guerrero was Mr. Martin's mother. At all relevant times, Ms. Guerrero was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

13.     Plaintiff Terry Martin was Mr. Martin's father. At all relevant times, Mr. Martin was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

**Defendants**

14.     Defendant Adams County is a political subdivision chartered under the laws of the State of Colorado and is a "person" subject to suit under Title 42 U.S.C. Section 1983. Among other things, Adams County, through the Adams County Sheriff's Office ("ACSO"), operates the Adams County Detention Facility ("ACDF"), located at 150 N 19th Ave, Brighton,

CO 80601.

15.    Defendant Sheriff Gene Claps is the elected Sheriff of Adams County, and is the final decisionmaker in Adams County regarding policies, practices and customs pertaining to the operation of the ACDF.

16.    Defendant Adams County Board of County Commissioners act collectively as the governing board of the county. The Board manages the affairs of the county as authorized by the state.

17.    Defendants Adams County, Sheriff Gene Claps in his official capacity, and Board of County Commissioners are collectively referred to herein as "Adams County."

18.    Defendant Adams County is responsible for the oversight, supervision, discipline, and training of the law enforcement personnel at ACDF.

19.    At all relevant times, Defendant Adams County had a nondelegable duty imposed by the Colorado and Federal constitutions to provide adequate medical care to inmates and detainees at ACDF. Adams County is liable under the nondelegable duty doctrine for the deliberate indifference of Defendant Wellpath, its contracted medical care provider, and its employees or contractors.

20.    Plaintiffs sent a timely notice of claim under the Colorado Governmental Immunity Act, C.R.S. § 24-10-101 *et seq*., to Adams County on or about September 27, 2022, providing notice of potential liability of Adams County and its employees arising from the facts of Mr. Martin's death as described herein.

21.    Defendant Wellpath LLC ("Wellpath") is a Delaware corporation with its principal address located at 1283 Murfreesboro Road, Nashville, Tennessee, and its registered agent in Colorado is Corporate Creations Network, Inc., located at 155 E. Boardwalk # 490, Fort

Collins, Colorado.

22.     Wellpath has previously been known by several other names, including at least

Correct Care Solutions ("CCS"), Correctional Healthcare Companies ("CHC"), and Correctional

Healthcare Management ("CHM"). The corporate organization, leadership, and governance of

Wellpath is substantially similar to that of its predecessor companies, and for all intents and

purposes pertaining to this action, it is the same company.

23.     At all times relevant to the subject matter of this litigation, Wellpath contracted

with Adams County to provide medical services to inmates at ACDF. At all relevant times,

Wellpath was responsible for the oversight, supervision, and training of all of the medical staff at

ACDF, including the Individual Defendants in this matter, and for the medical care of inmates

housed at ACDF.

24.     At all relevant times, Wellpath was acting under color of state law and performing

a central function of the state.

25.     Defendant Wellpath is a private corporation, and thus neither it nor any of its

employees or contractors are entitled to any immunity under the Colorado Governmental

Immunity Act on Colorado state law claims or qualified or any other immunity on the federal

law claims.

26.     Defendant H.I.G. Capital, LLC is a private equity firm doing business in

Colorado. It is the owner, manager, and partner of Wellpath. H.I.G. Capital was (and is)

responsible for the management, hiring, retaining, training, and supervising of Wellpath

executives and employees and Wellpath's contracts, policies, and practices, customs, and

finances in the service of providing medical care to inmates, including inmates such as Mr.

Martin, at the ACDF. Wellpath executives, directors, supervisors, and medical providers act on

behalf of H.I.G. Capital. H.I.G. Capital is the alter ego of Wellpath, and/or alternatively Wellpath

acts on behalf of H.I.G. Capital who has control over it.

27.     On October 1, 2018, Defendant H.I.G. Capital announced that it had acquired

Correct Care Solutions ("CCS") and merged it California Forensic Medical Group ("CFMG"),

which Defendant H.I.G. Capital had acquired in 2013. Previously, CCS had merged with

Correctional Healthcare Companies ("CHC").

28.     Defendant H.I.G. Capital renamed CCS and CMGC "Wellpath" in October 2018,

for the purpose of carrying Defendant H.I.G. Capital's ownership and financial interests in

providing jail mental and medical health care. Defendant H.I.G. Capital controls the assets and

financial gains while Wellpath assumes the liabilities.

29.     Defendant Wellpath was estimated to generate $2 billion in revenues in 2022.

30.     Defendant H.I.G. Capital endeavors to use the corporate entity as a shield against

liability and harm its companies cause to inmates in prisons and jails with serious medical

conditions.

31.     Treating Defendant H.I.G. Capital as a separate corporate entity that is not

responsible for the acts of the various corporations under its ownership and control would

promote injustice and defeat the rights and equities of persons such as Mr. Martin and Plaintiffs;

it would enable and facilitate continued Wellpath and H.I.G. Capital unconstitutional conduct,

practices, customs and policies, actions and inactions that harm particularly vulnerable jail

populations and discourage abatement of these unconstitutional actions and inactions.

32.     Defendant H.I.G. Capital exercises sufficient control over Defendant Wellpath's

activities such that Defendant Wellpath is a mere agent or instrumentality of Defendant H.I.G.

Capital.

33.     Defendant H.I.G. Capital places its senior partners and/or members on the boards
or managing bodies of Defendant Wellpath in order to maintain a high degree of day-to-day
control over Defendant Wellpath's activities. Michael Kuritzky was the Secretary and Chief
Financial Officer of Defendant Wellpath, while serving as a Principal of Defendant H.I.G.
Capital. Currently, he is a Managing Director for H.I.G. Capital and oversees the Advantage
Fund, which includes Wellpath as a portfolio company. Justin Reyna was on the board of
Defendant Wellpath, while serving as a Managing Director of Defendant H.I.G. Capital. He
continues to serve as a Managing Director for H.I.G. Capital's Advantage Fund, which includes
Wellpath as a portfolio company. Rob Wolfson is intimately involved with the day-to-day
management of Defendant Wellpath as Executive Managing Director of Defendant H.I.G.
Capital and Head of the H.I.G. Advantage Fund, which includes Wellpath as a portfolio
company. He specifically oversees H.I.G.'s global healthcare efforts, which encompasses
Wellpath.

34.     Defendant H.I.G. Capital acts through its employees, agents, directors, officers
and is responsible for the acts of its employees, agents, directors, and officers performed within
the scope of such agency. Defendants Wellpath and its employees and agents were acting on
behalf of Defendant H.I.G. Capital and Individual Medical Defendants were and are agents of
Defendant H.I.G. Capital and also Wellpath, and therefore Defendant H.I.G. Capital is
responsible for their conduct as described in this complaint.

35.     Defendant H.I.G. Capital has seats on the board of Defendant Wellpath and
controls, manages, and approves major policy decisions of Defendant Wellpath.

36.     Defendant Wellpath undertakes the provision of jail medical and mental health
services with the understanding that Defendant H.I.G. Capital is the principal in control of those

activities. Defendant H.I.G. Capital has authorized and in fact encouraged Defendant Wellpath to conduct those activities in a manner that prioritizes containment of costs and jeopardizes the lives of individuals with serious medical conditions, and Defendant H.I.G. Capital has or should have knowledge of all material facts about Defendant Wellpath's actions.

37.     Defendant H.I.G. Capital ratifies the conduct of Wellpath by knowingly accepting the risks of jail medical services and mental health services despite knowledge of past and current unconstitutional actions and inactions of its agent Wellpath at Adams County and elsewhere causing harm to sick and mentally ill inmates and detainees.

38.     Defendant H.I.G. Capital is a private corporation not entitled to immunity under the Colorado Governmental Immunity Act or otherwise.

39.     Defendant Adams County and Defendants Wellpath and H.I.G. Capital are collectively referred to herein as the "Entity Defendants."

40.     At all times relevant to the subject matter of this litigation, Defendant Jamie Lalicker was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Licensed Practical Nurse at ACDF, who was employed by, or an independent contractor for, Wellpath.

41.     At all times relevant to the subject matter of this litigation, Defendant Scarlett McCurry was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Licensed Practical Nurse at ACDF, who was employed by, or an independent contractor for, Wellpath.

42.     At all times relevant to the subject matter of this litigation, Defendant Karie

Mitchell was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Registered Nurse at ACDF, who was employed by, or an independent contractor for, Wellpath.

43.     At all times relevant to the subject matter of this litigation, Defendant Sonya Barrera was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Registered Nurse at ACDF, who was employed by, or an independent contractor for, Wellpath.

44.     At all times relevant to the subject matter of this litigation, Defendant Amanda Beckwith was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Registered Nurse at ACDF, who was employed by, or an independent contractor for, Wellpath.

45.     At all times relevant to the subject matter of this litigation, Defendant Andrea Pasillas was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Licensed Practical Nurse at ACDF, who was employed by, or an independent contractor for, Wellpath.

46.     At all times relevant to the subject matter of this litigation, Defendant Maryann Martha Magley-Herman was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Mental Health Practitioner at ACDF, who was employed by, or an independent contractor for, Wellpath.

47.     At all times relevant to the subject matter of this litigation, Defendant Janice Marshall was a citizen of the United States and a resident of and domiciled in Colorado and was

acting within the scope of her official duties and under color of state law in her capacity as a Licensed Practical Nurse at ACDF, who was employed by, or an independent contractor for, Wellpath.

48.     At all times relevant to the subject matter of this litigation, Defendant Sara Post was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Licensed Practical Nurse at ACDF, who was employed by, or an independent contractor for, Wellpath.

49.     At all times relevant to the subject matter of this litigation, Defendant Aimee Olson was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Registered Nurse at ACDF, who was employed by, or an independent contractor for, Wellpath.

50.     At all times relevant to the subject matter of this litigation, Defendant Ashley Snyder was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Registered Nurse at ACDF, who was employed by, or an independent contractor for, Wellpath.

51.     At all times relevant to the subject matter of this litigation, Defendant Jessica Haakeson was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as a Licensed Practical Nurse at ACDF, who was employed by, or an independent contractor for, Wellpath.

52.     Defendants Lalicker, McCurry, Mitchell, Barrera, Beckwith, Pasillas, Magley-Herman, Marshall, Post, Olson, Snyder, and Haakeson are collectively referred to herein as "Individual Medical Defendants."

53.     At all times relevant to the subject matter of this litigation, Defendant Crystal Law was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as deputy at ACDF employed by Adams County.

54.     At all times relevant to the subject matter of this litigation, Defendant Kayla Hampel was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of her official duties and under color of state law in her capacity as deputy at ACDF employed by Adams County.

55.     At all times relevant to the subject matter of this litigation, Defendant Alan Berry was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and under color of state law in his capacity as deputy at ACDF employed by Adams County.

56.     At all times relevant to the subject matter of this litigation, Defendant Scott Fanselow was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and under color of state law in his capacity as deputy at ACDF employed by Adams County.

57.     At all times relevant to the subject matter of this litigation, Defendant Andrew Vassallo was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and under color of state law in his capacity as deputy at ACDF employed by Adams County.

58.     At all times relevant to the subject matter of this litigation, Defendant Lee Patton was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and under color of state law in his capacity as deputy at

ACDF employed by Adams County.

59.    At all times relevant to the subject matter of this litigation, Defendant Brandon Skalak was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of his official duties and under color of state law in his capacity as deputy at ACDF employed by Adams County.

60.    At all times relevant to the subject matter of this litigation, Defendant Yvon Benoit was a citizen of the United States and a resident of and domiciled in Colorado and was acting within the scope of their official duties and under color of state law in his capacity as deputy at ACDF employed by Adams County.

61.    Defendants Law, Hampel, Barry, Fanselow, Vassallo, Patton, Skalak, and Benoit are collectively referred to herein as "Individual Deputy Defendants" or "Deputy Defendants."

62.    All Deputy Defendants and Individual Medical Defendants are collectively referred to herein as "Individual Defendants."

**IV.    FACTUAL ALLEGATIONS**

**Carl Martin was a beloved son to his parents Belynn Guerrero and Terry Martin.**

63.    Carl Martin was born to Plaintiffs Terry Martin and Beylynn Martin on January 12, 1995.



64.     As a child, Mr. Martin didn't know a stranger and made friends easily. He had many friends growing up and was very active in sports. His favorite sports to play were basketball and baseball.

65.     Mr. Martin was very close with both of his parents. He idolized his father so much that he followed in his occupational footsteps to become an electrician, a career that Mr. Martin was passionate about.

66.     Mr. Martin had a big, close-knit family who knew him as the kind of man who would give the shirt off his back or his last dollar to anyone. He was always there to help his family members and friends move, to babysit, or just be a shoulder to cry on.

67.     On holidays, Mr. Martin was the one who would make sure the family celebrated with each other. He loved Halloween and made sure all of the children in the family were able to trick or treat. He would arrange to have a barbecue every summer, and he loved to hide the eggs

on Easter for the kids to seek and find.

68.     Mr. Martin also had a strong emotional bond with his siblings, Terry Jr., Rene, and Lois. Terry Jr. was one of Mr. Martin's best friends. Growing up, Carl was like a shadow to Terry Jr.; everything Terry Jr. would do, Carl would be there. Terry Jr. and Carl had all the same friends. To this day, Terry Jr. finds himself reliving the devastating loss whenever a friend who doesn't know Carl is dead asks where he has been.

69.     Carl was extremely close with his nephew, Jeremiah. Jeremiah and Carl would frequently hang out and play basketball together.



70.     Carl Martin was a role model for his family. His cousin, Octavia Brooks, saw Carl as a caretaker, someone who always ensured her safety. Carl was the godfather to her three children.



71.     At the time of his death, Mr. Martin would stay during the week with his mother and during the weekends with his father.

72.     Mr. Martin was 27 years old when Defendants' deliberate indifference to his medical needs at the ACDF caused his death.

**Mr. Martin was arrested and detained at Adams County Detention Facility.**

73.     Mr. Martin had a history of alcoholism, and experiencing symptoms of withdrawal when he was not drinking, including psychosis, shaking, hallucinations, seizures, vomiting, and nausea. Several times in his life he had spent time in the hospital or a detox facility when he was going through alcohol withdrawal.

74.     On March 30, 2022, at approximately 12:30 a.m., Thornton Police Department officers arrested Mr. Martin after a traffic stop because Mr. Martin had an outstanding warrant. Mr. Martin was a passenger in the car, not the driver.

75.     Mr. Martin's mother was present during the traffic stop. She told the officers that Mr. Martin had been drinking, and that when he was not drinking, he would get sick.

76.     Thornton police officers took Mr. Martin to Adams County Detention Facility, where he was detained.

77.     During Mr. Martin's seven-day detention at ACDF before his death, Mr. Martin's family members called the jail to express their concerns about his wellbeing. They informed ACDF staff that he would get sick when going through alcohol withdrawal.

**ACDF placed Mr. Martin on an alcohol withdrawal protocol and suicide watch.**

78.     During the intake process at ACDF, the deputy who was processing Mr. Martin noted that he had information or reason to believe Mr. Martin was suicidal or had made suicidal statements. Mr. Martin answered affirmatively to the following questions: whether he was injured or currently under a doctor's care, whether he was currently taking prescription medication, whether he had any disabilities or medical devices, and whether he was having suicidal thoughts.

79.     Defendant Wellpath is the contracted medical care provider hired by Adams County to provide medical care to jail detainees. Wellpath is a national, for-profit, private company.

80.     Wellpath EMT Hunter Shalyn Heisler performed Mr. Martin's medical receiving screening and his pre-segregation health evaluation at approximately 5:30 a.m. on March 30th.

81.     EMT Heisler noted several indications, based on what Mr. Martin told her and what she had observed, that Mr. Martin needed mental health care. She noted that he had attempted suicide within the last year, and within the last three months he experienced the following: he had a current or past mental health diagnosis; he had been hospitalized multiple times for psychological issues, including in the last year; he saw and heard things others did not, such as shadows and voices; he had concerns about his ability to cope emotionally; he felt he had

nothing to look forward to/felt hopeless; he stated that every day, he wished he was dead or

could go to sleep and not wake up; he had thoughts of killing himself, including in the past week;

he had been thinking about how he would kill himself, and he had some intention on acting on

such thoughts; and he had started to work out or had worked out the details of how to kill himself

and intended to carry out the plan. She also noted Mr. Martin responded affirmatively to the

question whether he had ever done anything, started to do anything, or prepared to do anything to

end his life.

82.     Mr. Martin also provided EMT Heisler information, which she recorded, that

revealed he was an alcoholic and in danger of alcohol withdrawal. Mr. Martin said that for over a

year, he used alcohol daily in an amount of eight beers and a few double shots; he last used

March 29th (the day before the interview); his last withdrawal was January 1st; and he was

currently withdrawing. He also reported that one of his suicide attempts involved alcohol.

83.     Other than Mr. Martin's depressed mood, suicidal thought content, and that he

was currently experiencing suicidal thoughts of self-harm, EMT Heisler did not record that Mr.

Martin experienced any alarming medical symptoms. For example, she noted that Mr. Martin's

level of consciousness was alert, he was alert and oriented x3—meaning that he was alert and

appropriately aware of his person, the place, and time—his appearance was well kept and not

abnormal, his behavior was calm and appropriate, his speech was clear/coherent, his affect was

appropriate, his thought process was goal-directed, and his mood was unremarkable.

84.     EMT Heisler placed Mr. Martin on suicide watch in an administratively

segregated cell, and she entered an emergent referral to mental health.

85.     EMT Heisler also placed Mr. Martin on "monitoring" and a Clinical Institute

Withdrawal Assessment ("CIWA") protocol for alcohol withdrawal. Because of the CIWA

protocol, she referred him to a mid-level medical provider.

86.    At approximately 5:59 a.m., Wellpath NP James Froncek placed orders consistent with the CIWA protocol. There is no indication that NP Froncek evaluated Mr. Martin before entering the orders, or, indeed, at any time during Mr. Martin's seven-day detention prior to his death.

87.    NP Froncek ordered that a CIWA assessment be performed on Mr. Martin three times per day for five days; that he be given 10 mg of diazepam three times per day for three days then twice per day for two days; that he be given 1 mg of folic acid and 100 mg of thiamine HCI (vitamin B1) for five days; and 25 mg of meclizine three times a day, as needed, for three days. The directions relating to the meclizine stated that nurses were to contact a higher-level provider if Mr. Martin was experiencing persistent nausea or vomiting or if such symptoms continued after two doses.

88.    Appropriate treatment of Mr. Martin was critical because severe alcohol withdrawal can be fatal.

89.    In its most severe form, alcohol withdrawal symptoms include visual hallucinations, tachycardia, hypertension, hyperthermia, agitation, disorientation, seizures, and excessive sweating. Symptoms can last up to seven days after alcohol cessation and may last even longer. In severe cases, the most acute symptoms develop three to seven days after drinking is stopped.

90.    Those most at risk for severe alcohol withdrawal include those, like Mr. Martin, who had experienced alcohol withdrawal in the past. Individual Defendants (medical and detention staff) knew that Mr. Martin was an alcoholic experiencing alcohol withdrawal, and they knew he had experienced it previously from his self-report at intake.

91.     The most important treatment for acute symptoms of severe alcohol withdrawal is the administration of benzodiazepines, including diazepam, which helps reduce symptoms including anxiety, muscle spasms, seizures, and insomnia. Benzodiazepines should be administered until withdrawal symptoms subside.

92.     Adequate hydration and nutrition are also critical components of alcohol withdrawal treatment, as dehydration is an important consequence of severe alcohol withdrawal. Symptoms of dehydration include increased heart rate, blood pressure, and disorientation. Left inadequately treated, dehydration during alcohol withdrawal may damage the organs, including causing kidney failure, and may be fatal.

93.     All Individual Medical Defendants, as trained nurses, knew the symptoms of severe alcohol withdrawal and the dangers of inadequately treating it. Further, all Individual Medical Defendants received training when they started as nurses at ACDF and then annually in the signs and symptoms of chemical intoxication and withdrawal.

**Individual Medical Defendants deliberately or recklessly failed to provide Mr. Martin with adequate treatment for severe alcohol withdrawal.**

94.     Throughout the five days that Mr. Martin was on the withdrawal protocol, Individual Medical Defendants failed more than once to perform the CIWA assessment. They also did not give him the required medication and then fabricated medical records stating that they had.

95.     When Individual Medical Defendants did perform the CIWA assessment, Mr. Martin's heart rate and blood pressure were often high and remained high through several days. High blood pressure is a sign of severe alcohol withdrawal. Likewise, a high heart rate can be a severe symptom of withdrawal, and dehydration can lead to cardiac complications during withdrawal, including arrhythmias and sudden death resulting from heart attack. Nonetheless,

demonstrating deliberate indifference to these warning signs, no nurse contacted a higher-level provider with concerns.

96.    Individual Medical Defendants also unjustifiably failed to ensure that Mr. Martin adequately drank water or Gatorade or otherwise remained hydrated, despite knowing that one of the dangers of alcohol withdrawal is severe dehydration.

97.    At no point did Individual Medical Defendants put Mr. Martin on IV fluids, which would have provided him with adequate hydration.

98.    Due to Individual Medical Defendants' lack of adequate medical care and monitoring, Mr. Martin's condition greatly and obviously deteriorated throughout his seven-day detention until his death.

99.    Individual Medical Defendants' deliberately chose to ignore well-established warning signs as Mr. Martin's condition deteriorated, choosing not to pursue efforts and alternatives to provide appropriate medical care, either by providing it themselves or obtaining the assistance of other medical providers or arranging to have Mr. Martin taken to the hospital.

100.    Likewise, Deputy Defendants are liable for making deliberate choices in failing to make any attempt to obtain appropriate medical care and treatment for Mr. Martin, despite observing symptoms that they knew meant Mr. Martin was at significant risk of severe injury or death. Indeed, Deputy Defendants observed Mr. Martin frequently, usually every 15 minutes, meaning they knew exactly how bad of shape Mr. Martin was in, yet they still failed to adequately alert medical staff or command staff at the jail regarding Mr. Martin's concerning and deteriorating condition.

### March 30, 2022

101.    On March 30, 2022, the following was *reported* in Wellpath medical records to

have occurred:

- Wellpath RN Debbie Steinmetz gave Mr. Martin meclizine at 5:59 a.m.

- Wellpath LPN Jamie Lalicker gave Mr. Martin diazepam at 7:05 a.m.

- LPN Lalicker gave Mr. Martin diazepam at 3:35 p.m.

- LPN Lalicker gave Mr. Martin meclizine at 3:45 p.m.

- Wellpath RN Richard Yoder gave Mr. Martin folic acid and thiamine HCI at 8:00 p.m.

- Wellpath LPN Krusha Joshi gave Mr. Martin diazepam at 11:35 p.m.

102.    However, video recordings of Mr. Martin's cell show that Mr. Martin was <u>not</u> given any medication at or any time near 7:05 a.m., meaning LPN Lalicker fabricated the records showing that Diezepam was given at that time.

103.    Wellpath's Controlled Substance Log falsely **reports** that *two* 10mg doses of diazepam were given to Mr. Martin at 8:00 a.m. and one 10mg dose was given at 9:00 p.m. This contradicts both the available video footage, which also does <u>not</u> show Mr. Martin being given any medication at or near 8:00 a.m. (Mr. Martin is seen lying under a blanket sleeping from 6:46 a.m. to 9:21 a.m., and there is no footage available for 9:00 p.m.) and Wellpath's medical records.

104.    RN Steinmetz charted that she took Mr. Martin's vitals at 5:46 a.m. and 5:57 a.m. Among other vitals, Mr. Martin's blood pressure was elevated at 128/82.

105.    RN Steinmetz reported that she conducted Mr. Martin's CIWA evaluation at 5:57 a.m. She noted he had mild nausea with no vomiting, and he was mildly anxious. She also put in a referral to behavioral health/mental health because Mr. Martin expressed thoughts about self-harm. RN Steinmetz wrote that she offered Mr. Martin Gatorade, but she did not include whether

he drank it.

106.    Wellpath medical records indicate that at approximately 9:21 a.m. and 10:17 a.m. on March 30th, Mr. Martin vomited. Video of Mr. Martin's cell show that he vomited from 9:22 a.m. through 9:23 a.m.; from 10:46 a.m. through 10:49 a.m.; 11:48 a.m. through 11:49 a.m.; and from 12:27 p.m. through 12:30 p.m. Individual Medical Defendants did not record many of these specific incidents in the medical records.

107.    At approximately 9:23 a.m., LPN Lalicker took Mr. Martin's vitals. His heart rate increased from 5:57 a.m. from 92 beats per minute (BPM) to 107 BPM, and his blood pressure increased to 149/97, which is high.

108.    LPN Lalicker's CIWA evaluation of Mr. Martin at the same time reports that he was experiencing constant nausea and frequent dry heaves and vomiting, he had moderate tremors, was mildly anxious, and a very mild headache/fullness in the head. The points allotted to each of these categories under the CIWA scoring system were high enough cumulatively that the CIWA directions instructed nurses to contact a higher-level provider if he received 3 sequential scores that were around as high. Again, LPN Lalicker noted that she offered Mr. Martin Gatorade but not whether he drank it.

109.    At 3:41 p.m., LPN Lalicker recorded Mr. Martin's vitals including, among other things, another elevated heart rate of 109 and high blood pressure of 143/94.

110.    LPN Lalicker performed Mr. Martin's CIWA evaluation also at 3:41 p.m. She recorded that he was experiencing constant nausea and frequent dry heaves and nausea, moderate tremors, more than normal agitation, and mild anxiety. Again, his cumulative CIWA score was high enough that the instructions directed to consult with a higher-level provider if there were 3 sequential CIWA scores around as high. LPN Lalicker made no report to a medical provider.

LPN Lalicker noted she offered Mr. Martin Gatorade but not whether he drank it.

111.    LPN Joshi recorded Mr. Martin's vitals at 9:28 p.m., including that his heart rate had dropped to 89 BPM and his blood pressure was 134/90. LPN Joshi also conducted a CIWA evaluation at the same time, charting that Mr. Martin had mild nausea with no vomiting, tremors that were not visible but could be felt fingertip to fingertip, barely perceptible sweating with palms moist, mild anxiety, and a mild headache/fullness in the head. LPN Joshi wrote that she offered Mr. Martin Gatorade but did not state whether he drank it.

112.    Video footage from March 30th does not start until approximately 6:45 a.m. because Mr. Martin was not taken from intake to a cell until then. Then, starting at 1:00 p.m. on March 30th through the end of the day (11:59 p.m.), an eleven-hour period, Adams County destroyed or otherwise failed to preserve functioning video footage. Accordingly, no independent confirmation exists that Mr. Martin was in fact provided meclizine at 5:59 a.m., diazepam at 3:35 p.m., meclizine at 3:45 p.m., folic acid and thiamine at 8 p.m., and diazepam at 11:35, or that he received a CIWA assessment at 5:57 a.m., 3:41 p.m., or 9:28 p.m.

113.    None of the existing video footage obtained through open records requests and investigation shows that Mr. Martin ate anything March 30th, and footage from Mr. Martin's cell shows only that he drank half a cup of water at 9:26 a.m.

### March 31, 2022

114.    On March 31, 2022, Wellpath mental health practitioner (MHP) Maryann Martha Magley-Herman conducted a suicide watch initial assessment of Mr. Martin. Mr. Martin's responses to the questionnaire indicated he remained suicidal, although he denied that he had a specific plan about how to kill himself. He also reported that he had a diagnosed history of schizophrenia and substance use disorder. MHP Magley-Herman estimated Mr. Martin's current

self-harm/suicide risk level as high. She further noted that Mr. Martin's risk factors for suicide

included that he was intoxicated or detoxing from alcohol/drugs, he was impulsive, and he felt

hopelessness, feelings of guilt/burden/worthlessness flashbacks, severe anxiety, agitation, and

overwhelmed.

115.    MHP Magley-Herman stated that Mr. Martin's appearance, speech, mood, affect,

thought content, and behavior were appropriate; his thought form was coherent; he was oriented

to person, place, time, and situation; his intelligence was average, and his memory, insight, and

judgment were all intact.

116.    MHP Magley-Herman determined that Mr. Martin should remain on suicide

watch and meet daily with an MHP. MHP Magley-Herman did not refer Mr. Martin to a

psychiatrist or another higher-level medical provider.

117.    Wellpath ACDF records *report* that on March 31, 2022, the following occurred:

- Wellpath LPN Scarlett McCurry (aka Scarlett Davis) gave Mr. Martin
  diazepam at 7:05 a.m.

- LPN McCurry gave Mr. Martin meclizine at 10:17 a.m.

- LPN McCurry gave Mr. Martin diazepam at 3:35 p.m.

- Wellpath RN Karie Mitchell gave Mr. Martin folic acid and thiamine HCl
  at 8:00 p.m.

- RN Mitchell gave Mr. Martin meclizine at 9:57 p.m.

- RN Mitchell gave Mr. Martin diazepam at 11:35 p.m.

118.    However, video footage of Mr. Martin's cell show that he was <u>not</u> provided any

medication at or any time around 3:35 p.m., at or around 8 p.m., or at or around 11:35 p.m.

Accordingly, LPN McCurry fabricated records that he was provided diazepam at 3:35 p.m., and

RN Mitchell fabricated records that he was provided folic acid and thiamine HCI at 8 p.m. and

that he was provided diazepam at 11:35 p.m. Mr. Martin thus appears to have only received one

dose of diazepam on March 31st.

119.     Additionally, Wellpath's Controlled Substance Log reports only that *two* 10mg

doses of diazepam were given at 4:00 p.m., which is contradicted by both the video recordings

and the medical records. The Controlled Substance Log shows no other entries of diazepam

given on March 31st, 2022.

120.     Video recordings also show that the Mr. Martin likely spit out the dose of

Meclizine he received at around 9:55 p.m., meaning that RN Mitchell did not ensure he took the

medication despite, as a nurse, knowing the importance of making sure patients actually

swallowed their medication. Available records do not reflect that RN Mitchell took any steps to

address or ameliorate the risks of Mr. Martin's failure to ingest the medicine.

121.     Video recordings show that Mr. Martin ate very little on March 31st, eating

several bites of food at 10:58 a.m., three bites of food at 4:37 p.m., and a small amount of food at

6:17 p.m.

122.     Mr. Martin's records from ACDF show only one CIWA evaluation, not three as

ordered, from March 31st. At 10:15 a.m., LPN McCurry charted that Mr. Martin was

experiencing nausea/vomiting, a very mild headache/fullness in the head, and—contrary to the

suicide watch initial assessment performed the same day, which stated he was oriented to person,

time, situation, and place—regarding orientation, he could not do serial additions or was

uncertain about the date. LPN McCurry noted she offered Gatorade but not whether Mr. Martin

drank it.

123.     At the same time, LPN McCurry recorded that Mr. Martin had an elevated blood

pressure of 147/87.

*April 1, 2022*

124.    Wellpath ACDF records *report* that on April 1, 2022, the following occurred:

- Wellpath RN Sonya Barrera gave Mr. Martin diazepam at 7:05 a.m.

- RN Barrera gave Mr. Martin meclizine at 10:40 a.m.

- Wellpath RN Amanda Beckwith gave Mr. Martin diazepam at 3:35 p.m.

- RN Mitchell gave Mr. Martin folic acid and thiamine HCI at 8:00 p.m.

- RN Mitchell gave Mr. Martin meclizine at 10:08 p.m.

- RN Mitchell gave Mr. Martin diazepam at 11:35 p.m.

125.    However, video recordings of Mr. Martin's cell show that Mr. Martin did <u>not</u> receive any medication at or any time around 7:05 a.m., at or around 8 p.m., or at or around 11:35 p.m. RN Barrera fabricated records that he received diazepam at 7:05 a.m. and RN Mitchell fabricated records that he received folic acid and thiamine HCI at 8 p.m. and that he received diazepam at 11:35 p.m. Like the day before, Mr. Martin appears to have only received one dose of diazepam on April 1st, not three as prescribed.

126.    Additionally, Wellpath's Controlled Substance Log shows that Mr. Martin was given 10mg of Valium (which is a brand name for diazepam, not meclizine) at 10:39 a.m. This contradicts the medical records, which report that RN Barrera gave Mr. Martin meclizine at 10:40 a.m. There are no other entries in the Controlled Substance Log for April 1, 2022.

127.    That day, Mr. Martin again ate very little, eating only one bite of bread around 5:52 a.m. and part of a sandwich at 11:10 a.m.

128.    Per medical records, RN Mitchell *reported* that she took Mr. Martin's vitals at 12:51 a.m. She recorded that his heart rate was 102 BPM, which is high, and his blood pressure

was 131/95, which is also high.

129.    Also per medical records, RN Mitchell *reported* that she performed the CIWA

evaluation of Mr. Martin at the same time. She noted he was experiencing mild nausea with no

vomiting, tremors that were not visible but could be felt fingertip to fingertip, barely perceptible

sweating with palms moist, mild anxiety, and a very mild headache/fullness in the head. She

stated that she offered Mr. Martin Gatorade but not whether he drank it.

130.    However, video recordings show that **at no time** at or around 12:51 a.m. does Mr.

Martin leave his cell, and no nurse comes into his cell either. RN Mitchell's records noting such

encounters were fabricated.

131.    At 10:37 a.m., RN Barrera reported that she took Mr. Martin's vitals and

performed the CIWA evaluation. She recorded that his heart rate remained high at 108 BPM, and

his blood pressure remained elevated at 142/93. She noted Mr. Martin's CIWA score for

nausea/vomiting was 3 out of 7, it was 2 out of 7 for tremors, and he was experiencing barely

perceptible sweating with palms moist, and a headache/fullness in the head. She further noted

that she offered Gatorade to Mr. Martin but did not state whether he drank it.

132.    At 3:38 p.m., RN Beckwith recorded Mr. Martin's vitals including that his heart

rate remained high at 101 BPM but his blood pressure had dropped to 110/68, which is closer to

normal.

133.    RN Beckwith reported that she performed the CIWA evaluation on Mr. Martin,

charting that he had mild nausea with no vomiting and no other symptoms of withdrawal. She

stated she offered him Gatorade but not whether he drank it.

134.    Contrary to Individual Medical Defendants' failure to note any alarming

withdrawal symptoms, ACDF deputies on duty on April 1st reported concerning behavior. For

example, Deputy Crystal Law wrote in a report that when Mr. Martin was standing at the door of

his cell, he would start yelling to his mom and dad and staring off as if he were looking at them.

He then started talking to his girlfriend. He yelled, "They locked me in here baby, they won't let

me out!" while staring off again. When Deputy Law told him that his girlfriend was not there,

Mr. Martin responded that "she is right there, I can see her!" He then continued staring off.

135.    Similarly, Deputy Kayla Hampel wrote in a report that when she arrived on shift

around 7:00 p.m., Mr. Martin was standing at his cell door, where he remained for most of her

shift. She reported that he was shaking and scared.

136.    Video recordings from April 1st also show that Mr. Martin is hallucinating and

agitated. The footage shows that he almost never sleeps the entire day and night; he repeatedly

picks at the floor and the wall; he repeatedly talks to himself at the door and in the mirror; he's

very fidgety with his blanket and suicide smock, habitually folding them and refolding them; he

repeatedly walks to the door and back to sit on his mat; he repeatedly fidgets with pieces of paper

and pieces of toilet paper that he picks up; and he repeatedly touches his cellmate's blanket, with

at one point around 11:30 p.m. nudging his cellmate or touching his head.

137.    The video recordings and deputies' reports, among other things, cast serious

doubt on the accuracy of Individual Medical Defendants' CIWA evaluations that stated,

essentially, that Mr. Martin was not experiencing these sorts of symptoms. An inference arises

that either Individual Defendants did not actually perform the CIWA evaluations—which is

consistent with video footage showing that RN Mitchell (for example) did not perform a CIWA

when she said she did at 12:51 a.m.—thus did not observe these symptoms, and fabricated their

reports, or they did perform the evaluations, observed these symptoms, and deliberately chose to

omit them from their reports.

138. Defendants Deputies Law and Hampel, despite observing and noting alarming and medically significant symptoms that Mr. Martin was experiencing, recklessly took no action to attempt to obtain medical attention and assistance for Mr. Martin.

139. Likewise, Defendants Deputies Law, Hampel, and Fanselow, each of whom performed some rounds that entailed checking on Mr. Martin every 15 minutes, also observed Mr. Martin's deteriorating condition, yet recklessly failed to ensure that he obtain the medical care that he obviously needed.

### April 2, 2022

140. Wellpath ACDF records *report* that on April 2, 2022, the following occurred:

- RN Sonya Barrera gave Mr. Martin diazepam at 8:05 a.m.

- RN Karie Mitchell gave Mr. Martin folic acid and thiamine HCI at 8:00 p.m.

- RN Mitchell gave Mr. Martin diazepam at 8:05 p.m.

141. Wellpath's Controlled Substance Log *reports* that one 10mg dose of diazepam was given at 11:38 a.m., and shows no other entries for that day. This is contradicted by the medical records.

142. That day, Mr. Martin ate even less than the day before, eating only 5 bites of food around 10:35 a.m. Indeed, at around 5:43 a.m., Mr. Martin poured some of his food down the toilet, as shown by video footage.

143. Video surveillance in the jail is observable by detention and medical staff on duty, and such staff are responsible for monitoring detainees such as Mr. Martin to ensure their health and welfare are being maintained.

144. Mr. Martin drank only a minimal amount of liquid on April 2nd after 3 a.m. He

was taken to a new cell around 7:43 a.m., and did not have even a cup for water until around

11:49 a.m. He attempted to drink out of the faucet a few times between 8:30 and 9 a.m., he drank

only a tiny bit around 11:49 a.m., he drank some of a cup of water around 12:06 p.m., and he

drank some Gatorade over 9 hours later, around 9:29 p.m., but gave the rest to his cellmate.

145.    Per medical records, RN Mitchell *reported* that she took Mr. Martin's vitals at

1:35 a.m. and reported that that his heart rate was high, at 105 BPM. She also claimed she

performed his CIWA evaluation, noting that he was experiencing mild nausea with no vomiting,

tremors that were not visible but could be felt fingertip to fingertip, barely perceptible sweating

with palms moist, agitation, mild anxiety, and a very mild headache/fullness in the head. She

recorded that she offered him Gatorade but not whether he drank it.

146.    However, video recordings show that Mr. Martin <u>never</u> left his cell at or any time

around 1:35 a.m., <u>nor</u> did a nurse come into his cell at or around that time. Records showing

activity during these times appear to be fabricated.

147.    At 11:32 a.m., RN Barrera recorded Mr. Martin's vitals including a heart rate of

115 BPM. RN Barrera also claimed to have performed the CIWA evaluation, noting that Mr.

Martin was experiencing nausea/vomiting at a severity of 3 of 7 on the CIWA scale and severe

tremors. His cumulative CIWA score was high enough that the CIWA directions instructed her

to contact a higher-level provider if the score stayed around that high for 3 sequential CIWA

evaluations. Nurse Barrera highlighted that Mr. Martin's heart rate was greater than 110, but she

nevertheless did not contact a higher-level provider. RN Barrera noted that she offered Mr.

Martin Gatorade but not whether he drank it.

148.    At 2:42 p.m., Wellpath LPN Andrea Pasillas *reported* that Mr. Martin's vitals

were all normal. LPN Pasillas also said she performed the CIWA evaluation, *reporting* that he

had no symptoms. LPN Pasillas noted that she offered Mr. Martin Gatorade but not whether he
drank it.

149.    LPN Pasillas' report is shockingly inconsistent with the video recordings of Mr.
Martin's behavior that day, as are RN Mitchell's and RN Barrera's to a lesser extent. The CIWA
evaluation has categories for tactile disturbances, auditory disturbances, visual disturbances,
anxiety, and orientation. Video footage shows that throughout the entire day and night of April
2nd, Mr. Martin was obviously experiencing symptoms in each of these categories, yet other
than RN Mitchell noting mild anxiety and some agitation, the nurses do not indicate Mr. Martin
having any of these symptoms.

150.    Video footage shows that Mr. Martin essentially never slept that entire day or
night; was very paranoid, anxious, and agitated; was naked most of the day and night; was
constantly moving and fidgeting when sitting down; was repeatedly walking from his mat to the
door to sitting on the floor; appeared to hallucinate all day and night as he was speaking to
himself and touching the walls like he was drawing on them or picking at them; was knocking at
the walls and the door; repeatedly touching the toilet for no apparent reason; was taking pieces of
toilet paper and paper and fidgeting with them; was very fidgety and repeatedly gesturing while
talking to himself; licked the wall twice at 2:06 p.m.; was banging and kicking at the door and
banged his head against it; was constantly fiddling with his blanket and suicide smock and was
very restless; reached into the toilet several times, with at least two times being after he had used
it to urinate or defecate; was constantly moving food containers around the cell but not eating;
and was repeatedly touching his cellmate's mat, blanket, feet and hand. For example, from 3:30
to 3:50 a.m. he rearranged his cellmate's blanket several times and pulled his blanket off him
once, and from 7:02 to 7:05 p.m., he rubbed his cellmate's feet and put his blanket over his

cellmate's feet. At around 8:22 p.m., guards yelled at him for touching his cellmate after he had
scooted over and lifted his cellmate's mat and then started touching his feet.

151.    Deputy reports from April 2nd, as well as notes by MHP Magley-Herman who
observed Mr. Martin that day, further cast doubt on the accuracy of Individual Medical
Defendants' records, with deputies and MHP Magley-Herman reporting Mr. Martin exhibiting
very concerning behavior that Individual Defendants either did not see—because they did not
actually perform the CIWA evaluations that they claimed to have  performed—or deliberately
chose to omit obvious and disturbing symptoms from Mr. Martin's chart.

152.    According to Deputy Law, Mr. Martin would take off his suicide prevention gown
and randomly yell and speak like he was talking to someone, but not his cellmate. He began
standing over his cellmate and tapping his blanket; when told not to, Mr. Martin responded that
they were just playing video games. There were, of course, no video games in the cell. Mr.
Martin was hallucinating.

153.    Deputy Alan Barry wrote in a report that Mr. Martin's behavior was erratic
***throughout the whole day***. Deputy Barry stated that Mr. Martin refused to keep his anti-suicide
blanket covering himself, and Mr. Martin did not make any sense when Deputy Barry spoke to
him. Mr. Martin had to be told to keep his blanket on and not bother his cellmate, to which he
responded that they were just playing video games. When Mr. Martin was out of his cell, he sat
in the shower for the majority of the time.

154.    Deputy Barry's report casts doubt on the accuracy of Individual Medical
Defendants' records from March 31st through April 2nd to the extent those records do not report
that Mr. Martin had symptoms because Deputy Barry described Mr. Martin appearing, even to a
medical layperson, as paranoid and not in touch with reality. Mr. Martin would comment on his

cousin or sister being in the cell with him. He also made the strange comment of "there was no

way they could find my fingerprints there."

155.    Deputy Scott Fanselow wrote in his report that Mr. Martin filled his water cup

multiple times with water from the toilet.

156.    These deputies do not appear to have reported their observations of Mr. Martin's

obvious and serious medical distress to their own supervisors or to medical providers or medical

staff.

157.    Also on April 2nd, MHP Magley-Herman observed Mr. Martin for suicide watch

assessment. She wrote that he refused to engage with her and answer questions regarding current

suicidal ideation, and he was presenting erratically, taking his clothes off, and dancing around.

She also noted his appearance was disheveled and his behavior was withdrawn. MHP Magley-

Herman checked the box on the assessment instructing that Mr. Martin stay on suicide watch and

continue with daily MH meetings—which apparently she did not do the previous day, April 1st,

as there are no mental health records from that date. Although Mr. Martin's condition had

obviously deteriorated since the last time she observed him on March 31st, MHP Magley-

Herman did not contact a psychiatrist or higher-level medical provider or take other appropriate

steps to ensure proper treatment.

158.    Defendants Deputies Law, Fanselow, and Barry, despite observing and noting

alarming and medically significant symptoms that Mr. Martin was experiencing, recklessly took

no action to attempt to obtain medical attention and assistance for Mr. Martin.

159.    Likewise, Defendants Deputies Barry, Law, Hampel, and Fanselow, each of

whom performed some rounds that entailed checking on Mr. Martin every 15 minutes,

undoubtedly observed Mr. Martin's deteriorating condition, yet deliberately and recklessly failed

to ensure that he obtained the medical care that he obviously needed.

### *April 3, 2022*

160.    Wellpath ACDF records *report* that on April 3, 2022, the following occurred:

- Wellpath LPN Janice Marshall gave Mr. Martin diazepam at 8:05 a.m.

- Wellpath LPN Sara Post gave Mr. Martin folic acid and thiamine HCI at 8:00 p.m.

- Wellpath RN Aimee Olson gave Mr. Martin diazepam at 8:05 p.m.

161.    However, Wellpath's own records underline contradict the medication log, with other records stating that Mr. Martin underline refused to take the folic acid and thiamine HCI, as well as the diazepam at 8:05 p.m. Deputy Brandon Skalak also wrote in a report that he observed a nurse at around 10:11 p.m. ask Mr. Martin if he wanted his detox meds, and he appeared to respond by shaking his head "no." Deputy Skalak wrote he was not provided his detox meds at that time.

162.    There do not appear to be any Controlled Substance Log entries for April 3, 2022, supporting the conclusion that no diazepam was given to him on that day.

163.    Notably, jail video recordings show that underline no nurse saw or engaged with Mr. Martin at or around 8 p.m. or 8:05 p.m., indicating that the records *reporting* such encounters were fabricated. Footage shows that around 10:11 p.m., guards and a nurse, presumably LPN Post or RN Olson, are at Mr. Martin's cell door, but they never even open it. To the extent the conversation Deputy Patton noted would have occurred, it would have had to occur through the closed door.

164.    Thus, Defendants LPN Post and RN Olson failed to ensure, and indeed made almost no effort to ensure, that Mr. Martin received the critical medications he needed to address his withdrawal symptoms.

165.    Video footage shows that Mr. Martin ate almost nothing on April 3rd, eating one bite of food at 10:50 a.m. He used a piece of cup that he had put in the toilet to scoop up the bite of food.

166.    Per video footage, Mr. Martin also drank almost nothing that day, having only three sips of water at 3 a.m. and 11:41 a.m. At approximately 5:00 a.m., 5:37 a.m., and 5:42 a.m., Mr. Martin scooped water out of the toilet with his cup and drank a little. He did the same thing at approximately 11:10 a.m. to 11:20 a.m., at which time the toilet had urine in it when he drank from it. Before he drank from the cup, he also appeared to scratch at the door to remove paint chips or similar material and catch the paint chips in his cup.

167.    Mr. Martin also appeared to be nauseous in footage, hovering over the toilet like he was going to vomit at 1:11 a.m., 1:14 a.m., and 3:44 a.m.

168.    Per records, RN Mitchell **_reported_** Mr. Martin's vitals at 1:45 a.m. including that his heart rate was elevated at 108 BPM and his blood pressure was very high at 162/98. She also **_claimed_** to have performed the CIWA evaluation at that time, noting that Mr. Martin was experiencing mild nausea with no vomiting, tremors with a severity of 3 out of 7 on the CIWA scale, barely perceptible sweating with palms moist, auditory disturbances with "very mild harshness or ability to frighten," and mild anxiety. She noted she offered him Gatorade but not whether he drank it.

169.    However, Mr. Martin does <u>not</u> leave his cell at or any time near 1:45 a.m., nor does any nurse come into his cell. Records purporting to reflect such a medical staff encounter appear to be fabricated.

170.    It does not appear that any other CIWA evaluation was performed on Mr. Martin that day, as ACDF records do not include another completed CIWA assessment form. Certain

records ambiguously suggest a CIWA may have been performed at 12:22 p.m., but video footage shows that Mr. Martin did <u>not</u> leave his cell within hours of that time, nor did a nurse come into his cell. Similarly, ambiguous records *report* that Mr. Martin refused a CIWA evaluation at 5:41 p.m., but Mr. Martin did <u>not</u> leave his cell within hours of that time either, nor did a nurse come in. Accordingly, RN Mitchell fabricated her single CIWA assessment, and no CIWA evaluation at all appears to have been performed on Mr. Martin on April 3rd.

171.    Per video footage, ACDF deputies' reports, and a mental health assessment completed by an RN, Mr. Martin's condition continued to deteriorate even further on April 3rd, with Individual Medical Defendants taking no steps to address such deterioration despite observing it, being informed about it, and/or it being obvious.

172.    Video footage shows that during April 3rd, Mr. Martin lied down but did not seem to sleep; he was constantly picking at the wall and floor; he was naked a lot; he looked very agitated; he was pacing around the room; at 1:19 a.m., he picked up little pieces of paint or rocks and put them on his cellmate's blanket; at 1:43 a.m., he put his hands in the toilet bowl after he flushed it; at 4:40 a.m., he grabbed his cellmate by his arm; at 5:55 a.m., he hit his cellmate; at 10:43 a.m., he was messing with his cellmate's mat and blankets; at 4 p.m., when guards took him to another cell, he looked like he was having trouble walking; and at 4:59 p.m., he put his hands in the toilet bowl again.

173.    Deputy Hampel wrote in a report that around 3 a.m., Mr. Martin was observed on camera filling his cup and drinking from the toilet. She reported that throughout the morning, he continued to sit in different corners of the room talking to the corners and through the window at the bottom of the door.

174.    It does not appear that Deputy Hampel even reported her observations of Mr.

Martin's obvious and serious medical distress to her own supervisors or to medical providers or medical staff.

175.    Around 5:55 a.m., Mr. Martin was observed by deputies repeatedly sitting on his cellmate's mattress and touching and taking his cellmate's blanket. Deputies responded by ordering him to sit on his own mattress. In at least one instance, after deputies left the cell, he began crawling on the floor toward his cellmate's mattress. Eventually, deputies removed Mr. Martin from the cell and moved him to a different cell where he was housed alone. Video footage shows that when the deputies removed Mr. Martin from the cell, they unnecessarily slammed him against the wall to cuff him, then dragged him out of the cell.

176.    In a later statement, Mr. Martin's cellmate stated that Mr. Martin kept walking up to the walls and touching them, saying he was trying to open the doors and needed keys. Mr. Martin's cellmate said that Mr. Martin was talking to himself, walking back and forward shaking, sitting on his cellmate's mattress—his cellmate thought Mr. Martin thought it was his mattress, and not eating. Mr. Martin's cellmate stated that Mr. Martin "just didn't look good at all."

177.    Deputy Lee Patton observed Mr. Martin allegedly refuse to take his detox medications. Deputy Patton wrote in a report that RN Olson asked Mr. Martin if he wanted his medication, he heard Mr. Martin mutter something, and RN Olson said Mr. Martin had refused. Deputy Patton observed that Mr. Martin was lying naked near the door at the time. Deputy Patton stated that Mr. Martin did not appear to be too interested in meals but did "take them" after deputies told him he needed to eat, and specifically noted in his report that deputies do not commonly monitor what inmates consume unless instructed to do so by medical staff. Deputy Patton reported that he told RN Olson that Mr. Martin did not look great.

178.    Deputy Skalak, who had not seen Mr. Martin since March 30th until his April 3rd shift, also mentioned to a nurse, either RN Olson or RN Post, that Mr. Martin was not looking good and appeared to have lost quite a bit of weight in the interim.

179.    Nothing in the records indicate that either Nurse Olson or Nurse Post contacted a higher-level provider, provided any additional treatment, or took any action to attempt to address Mr. Martin's deterioration in response to the deputies' statements and Mr. Martin's obvious state of unwellness.

180.    Neither Deputy Patton nor Deputy Skalak took further action to ensure that Mr. Martin received the care he obviously needed once it became clear to them that the nurses were not providing him with patently necessary care.

181.    Likewise, Defendants Deputies Benoit, Skalak, and Patton, each of whom performed some rounds that entailed checking on Mr. Martin every 15 minutes, observed Mr. Martin's deteriorating condition, yet deliberately and/or recklessly failed to ensure that he obtained the medical care that he obviously needed.

182.    At 11:40 p.m. on April 3rd, an RN designated as "Amanda," presumably RN Beckwith, performed a suicide watch check on Mr. Martin. RN Beckwith **reported** that Mr. Martin was adherent with his detox meds, which was untrue given that he had earlier that day refused to take them, which his chart showed. RN Beckwith circled "yes" for patient refusing meals/liquids. RN Beckwith also described Mr. Martin as not oriented to person, place, and time; not easily engaged; not neat; not making eye contact; not future oriented; confused; little to no eye contact; odd/bizarre; unkempt/malodorous; nonsensical/disorganized; expressing concern about his ability to cope; and expressing thoughts/plans for suicide.

183.    RN Beckwith concluded that the plan for Mr. Martin was to continue to see him.

She nevertheless did not contact a psychiatrist, nor did she contact another higher-level medical provider even though Mr. Martin had very substantially deteriorated since previous mental health and medical checks. Also concerning was that RN Beckwith was explicitly aware he was refusing food and drink and as a nurse knew dehydration was a significant danger with alcohol withdrawal, yet she took no steps to ensure he remained hydrated or stayed on the detox protocol, or received any other appropriate treatment.

184.    Further, it is unclear how thorough RN Beckwith's evaluation of Mr. Martin was (or whether it occurred at all), given that video footage shows that at no time did she enter his cell. Rather, footage shows that from 11:47 a.m. to 11:51 a.m., a nurse and deputy stand outside Mr. Martin's closed cell door. It thus seems likely that, at most, RN Beckwith based her evaluation solely on the deputy's observations from that day of Mr. Martin, and she did not perform her own assessment. Given that RN Beckwith, as a nurse, knew the dangers of withdrawal, there is no justification for RN Beckwith's failure to perform her own medical evaluation of Mr. Martin.

### April 4, 2022

185.    Despite the fact that on the previous day Mr. Martin continued to experience withdrawal symptoms per the CIWA and his heart rate and blood pressure were high, and that Mr. Martin was exhibiting alarming behavior and deputies had raised concerns about his medical condition, Individual Medical Defendants did not contact a higher-level provider at the end of the five-day detox protocol or extend Mr. Martin's detox treatment. Rather, the detox protocol was allowed to expire, and on April 4th, Individual Medical Defendants stopped providing Mr. Martin with detox treatment (to the extent they had provided any previously).

186.    At approximately 12:14 a.m., RN Olson *reported* that she performed a CIWA

evaluation on Mr. Martin. The only vital she recorded was a respiration rate of 24, which is high, and RN Olson specifically noted that his respiration was greater than or equal to 20. A high respiration rate is a symptom of alcohol withdrawal, and Wellpath's CIWA protocol mandates contacting a healthcare provider if respirations are persistently above 20. RN Olson claimed in her note that Mr. Martin refused to let her check his pulse, temperature, and blood pressure. She recorded that he was moderately fidgety and restless and moderately anxious or guarded. His cumulative CIWA score was high enough at this stage of withdrawal that the CIWA evaluation directions instructed RN Olson to contact a higher-level medical provider. There is no indication that she did so, however, despite, as a nurse, being aware of the dangers of alcohol withdrawal and a high respiratory rate. RN Olson wrote that she offered Mr. Martin Gatorade but not whether he drank it.

187. It is unclear when RN Olson <u>actually</u> performed this CIWA evaluation on Mr. Martin, since video footage shows that he was not taken out of his cell hours before or hours after of 12:14 a.m., nor did a nurse enter his cell. The record reflecting the nurse assessment therefore appears to be fabricated.

188. On April 4th, Deputy Skalak again told a nurse that Mr. Martin was not doing well and appeared to have lost quite a bit of weight. Per Deputy Skalak, in response, the nurse asked Mr. Martin if he was doing alright, and he nodded. The nurse provided him with a cup of Gatorade and told him to drink lots of water. Deputy Skalak did not take any further action to obtain obviously needed medical care for Mr. Martin despite the fact he knew the nurse was not taking any adequate steps to obtain for Mr. Martin patently necessary medical care despite being aware of the problem.

189. No further action, such as contacting a higher-level provider, putting Mr. Martin

back on the detox protocol, or even ensuring more carefully that he was drinking and eating, was taken by the nurse, who was likely RN Ashley Snyder who was on duty.

190.    Video footage shows that the <u>only</u> times during the day when a nurse was even near Mr. Martin in his cell are 5:51 p.m., when a guard and nurse were in the hallway and the nurse looked into the cell while standing outside it, then the guard closed the door after 10 seconds, and from approximately 7:34 to 7:40 p.m., when a nurse talked through the door to an inmate in the cell next to Mr. Martin's but did not talk to Mr. Martin or look in his cell.

191.    At approximately 6:00 p.m., RN Snyder *claimed* to have performed a daily suicide watch check. Based on jail video footage, if it occurred it must have occurred at 5:51 p.m., when a guard opened Mr. Martin's cell door for ten seconds and RN Snyder was outside the cell and looked in. Per RN Snyder, Mr. Martin refused the visit. RN Snyder took no action in response to Mr. Martin's allegedly refusing to participate in the suicide watch check. RN Snyder *claimed* in the record that patient was not refusing meals/liquids, even though had she talked to the deputies, she would've been informed he was not eating.

192.    Deputy Andrew Vassallo wrote in a report on April 4th that he had started noticing Mr. Martin had stopped eating his meals and appeared that he had not moved from his mattress. This was a suspicious and disturbing sign of unwellness, in stark contrast to his behavior earlier during the detention, where he was constantly going to stand at the cell's door.

193.    It does not appear that Deputy Vassallo communicated to medical staff or his superiors his concerns over Mr. Martin's deteriorating condition. In fact, Defendant Deputy Vassallo, despite observing and noting alarming and medically significant symptoms that Mr. Martin was experiencing, deliberately and/or recklessly failed to attempt to obtain medical attention and assistance for Mr. Martin.

194.    Likewise, Defendants Benoit, Skalak, and Patton, each of whom performed some rounds that entailed checking on Mr. Martin every 15 minutes, observed Mr. Martin's continually deteriorating condition, yet deliberately and/or recklessly failed to ensure that he obtained the medical care that he obviously needed.

195.    Video footage from April 4th shows that Mr. Martin ate nothing on April 4th, and he drank almost nothing; from approximately 11:44 p.m. to 11:46 p.m., he drank from the tap for several seconds.

196.    Video footage also shows that Mr. Martin continued to deteriorate on April 4th. The footage shows that he was sleeping for hours at a time but remained very fidgety even while sleeping; he was mostly naked and a bruise on his right hip is very visible, as are his ribs, which stick out; at 10:51 a.m., he put his suicide smock in the toilet and a food box on top of it; he was very unsteady when he tried to stand up and needed to lean against a wall at times and fell often; at times he gestured like he was talking to someone who was not there, and he talked to himself but not as much as in previous days; there were instances of very heavy breathing when he lied down; he hallucinated throughout the day; he would touch the wall as if he was drawing or writing on it; he made strange movements with his arms, hands, and legs when he was sitting and lying down; he rocked back and forth while he was lying down; and he struggled to sit up from lying down. From 7:01 p.m. to 7:07 p.m., he was sitting on the floor and urinating. He then dragged his smock over to try to cover up the urine.

***April 5, 2022 – The Day Mr. Martin Died***

197.    Video footage from April 5th shows that Mr. Martin did not eat or drink at all that day, except for one instance, described below, in which he drank a bit from a cup of Gatorade that a guard gave him a little after midnight.

198.     Video footage also shows that Mr. Martin was lying down and sleeping almost the entire day, except for the following actions: at 12:00 to 12:02 a.m., Mr. Martin crawled off the toilet and lied down; from 12:13 to 12:55 a.m., he was alternating between lying down and sitting up; at 3:10 a.m., he picked up a food bag and looked into it but did not eat anything; at 4:48 a.m., while he was naked, he slid on the floor to reach into the food slot, pulled out the food that had been placed there by guards, then crawled back to his mat; from 5:57 a.m. to 6 a.m., he crawled off the mat and sat on the floor naked then crawled back to the mat; at 8:13 a.m., he sat up; from 10:29 to 10:30 a.m., he sat up; and at 12:15 to 12:16 p.m., he touched the wall.

199.     At approximately 12:05 a.m. on April 5th, Deputy Patton, who was assisting with med pass, asked LPN Jessica Haakenson to check on Mr. Martin to make sure he was okay, stating that Mr. Martin had not been drinking as much water as he should be and had been avoiding eating. Deputy Patton wrote in a report that Mr. Martin appeared to be thinner than the previous week.

200.     Per LPN Haakenson's *report*, she walked into the cell and woke Mr. Martin up, and she *reports* that he was alert and oriented x4—meaning fully alert and oriented to self, place, time, and situation. However, video recordings show that she never even went into the cell and instead talked with Mr. Martin from the doorway. Given the deputies' reports of Mr. Martin's behavior around this time, as well as video recordings showing his behavior, LPN Haakenson either deliberately failed to actually examine Mr. Martin, because if she did, she would not have stated he was alert and oriented x4, or she did examine him, knew he was not alert and oriented x4, and fabricated the records.

201.     LPN Haakenson *reported* that Mr. Martin finished two Styrofoam cups of Gatorade; video shows, however, that Deputy Patton gave Mr. Martin only one cup of Gatorade.

She claimed he was able to talk with her, and when she asked why he wasn't eating, she says he responded he wasn't hungry. She told him he needed to try to eat, and that he needed to advocate for himself to make sure he was hydrated. She had him fill up his cup with Gatorade again before she left the cell. When later asked during an interview why Deputy Patton did not let her all the way into the cell, she stated it might have been because Mr. Martin was "kind of not with it all the way."

202.    Deputy Patton wrote in his report that Mr. Martin was shaky, although he was able to sit up to take the cup of Gatorade. He told Mr. Martin not to drink too quickly so he would not get sick. He noted that Mr. Martin looked at him and appeared to nod his head.

203.    Despite the obvious signs that Mr. Martin was desperately sick and Deputy Patton's report that Mr. Martin was not eating and was drinking too little, LPN Haakenson did not contact a higher-level provider, did not take steps to put Mr. Martin back on the detox protocol, did not take any steps to send Mr. Martin to the hospital, and did not do even the bare minimum to ensure that Mr. Martin was and remained hydrated, despite, as a nurse, knowing the risks of dehydration with alcohol withdrawal.

204.    Once it became obvious that LPN Haakenson was not contacting a higher-level provider or taking any other steps to obtain patently necessary medical care for Mr. Martin, Deputy Patton had a known duty to take further action to attempt to obtain such care on Mr. Martin's behalf. Deputy Patton deliberately and/or recklessly failed to meet this duty.

205.    Additionally, Deputy Benoit, who performed rounds that entailed checking on Mr. Martin every 15 minutes, observed Mr. Martin's deteriorating condition, yet deliberately and/or recklessly failed to ensure that he obtain the medical care that he obviously needed.

206.    Deputy Vassallo wrote in a report that he noticed on April 5th that Mr. Martin's

condition had deteriorated. He wasn't eating his meals, and he hadn't moved from his mattress. Deputy Vassallo wrote that Mr. Martin was noticeably breathing and moving, but he couldn't do much more than that.

207.    Deputy Vassallo asked Sgt. Kenny Sherman to assess the situation. Sgt. Sherman wrote in his report that at around 12:15 p.m., he observed Mr. Martin on the floor of his cell; he appeared to be moving in slow motion and in need of medical attention. He asked Mr. Martin if he was doing okay, and Mr. Martin responded by moving his head slowly. He was gasping for air and appeared very weak. Sgt. Sherman informed Deputies Vassallo and Benoit that he was going to the medical unit with his concerns. He spoke to LPN Scarlett Davis (aka Scarlett McCurry) and told her that Mr. Martin needed to be seen and probably needed medical attention.

208.    Deputy Yvon Benoit wrote in a report that when Sgt. Sherman spoke to Mr. Martin at approximately 12:15 p.m., Mr. Martin's responses were incoherent; he would only mumble and nod his head as a form of response.

209.    Per his report, Deputy Vassallo entered Mr. Martin's cell at approximately 12:19 p.m. to remove his old meal and give him his new meal. He told Mr. Martin he needed to start eating and drinking water. Deputy Vassallo noted that Mr. Martin made eye contact and shook his head up and down and said "okay."

210.    Deputy Vassallo wrote in his report that at approximately 12:26 p.m., he entered Mr. Martin's cell to ask if he wished to go to his court appearance. Deputy Vassallo wrote in his report that Mr. Martin shook his head from left to right while making eye contact and said "no." Shaking his head "no" at approximately 12:26 p.m. on April 5th was the last reported movement Mr. Martin would make.

211.    LPN Davis did not arrive to Mr. Martin's cell to evaluate him until approximately

12:51 p.m.

212.    Video footage shows that at around 12:47 p.m., Mr. Martin appeared unconscious.

Between 12:48 p.m. and 12:50 p.m., Mr. Martin's head moved slightly rhythmically up and

down; it appears he may have been having convulsions.

213.    Nurse Davis then entered Mr. Martin's cell. Deputy Benoit reported that as Nurse

Davis began to examine Mr. Martin:

> I noticed his lips were darkened in color and his eyes rolled back where I could see
> the white part of his eye balls. His breathing was very faint. LPN Davis began to
> ask Martin questions. Martin did not respond to LPN Davis. LPN Davis began to
> feel for a pulse on Martin's carotid artery.

214.    Per LPN Davis's progress note, when she arrived, Mr. Martin was lying on his

back, nonresponsive. She noted he had a carotid purse and agonal breathing (agonal breathing

occurs when one's brain is not getting enough oxygen, and it is often a sign of stroke or cardiac

arrest). In a later report, LPN Davis stated Mr. Martin had no pulse at this time, which was

inconsistent with her progress note.

215.    LPN Davis advised Deputy Benoit to air the code for medical emergency and

unresponsive inmate over the radio.

216.    Deputy Tapia arrived and noted Mr. Martin was agonal breathing, with around 7

breaths a minute. Deputy Tapia initiated CPR and completed several rounds of chest

compressions. Video footage shows that Deputy Tapia did not initiate CPR until 12:57 p.m.,

which per the footage, was 7 minutes after medical staff entered the cell.

217.    Per LPN Davis, an AED was placed but malfunctioned. Per Deputy Tapia, a

backup AED unit was then retrieved and used. AED cycled several times with no shock advised.

An AMBU bag—a medical device to force air into the lungs of a patient who has stopped or is

struggling breathing—was used.

218.    According to Nurses Michelle Collins and Ashley Snyder, nasal Narcan was administered three times.

219.    RN Caitlin Templeton noted Mr. Martin was unresponsive to verbal and painful stimuli. She also noted that Mr. Martin had bruising in different stages of healing on both his lower legs and the sides of his chest.

220.    EMS arrived at ACDF at approximately 1:03 p.m., but did not reach Mr. Martin until approximately 1:09 p.m. An EMT reported that a delay occurred as equipment was gathered prior to entering the facility. The EMT noted that jail staff was unable to state when they last saw Mr. Martin alive, with staff stating, "he may have had a down time for 'up to ten minutes.'" An ACDF nurse told the EMT that Mr. Martin had been lethargic that day, but the nurse could not say whether that was his baseline. The nurse also reported that Mr. Martin had not eaten "for a few days."

221.    EMTs noted that Mr. Martin was completely unresponsive, pulseless, and apneic when they arrived. EMTs placed Mr. Martin on oxygen and took over CPR. Approximately 30 seconds later, the AED advised a shock, which was administered. Another shock was administered later. The EMTs also administered three doses of epinephrine and intubated Mr. Martin.

222.    Staff informed the EMTs that the bruises on Mr. Martin's extremities had just appeared within the last day or so. Based on that information and the pattern of Mr. Martin's EKG, EMTs administered treatment for acute kidney failure.

223.    Ultimately, a weak pulse and blood pressure were detected by EMTs, and at approximately 1:53 p.m., Mr. Martin was transported via ambulance to Platte Valley Medical Center (PVMC).

224. PVMC medical providers diagnosed Mr. Martin's with cardiac arrest and noted, among other problems, anemia, acute kidney injury, metabolic acidosis, and high blood potassium and sodium levels, which may be caused by dehydration.

225. The hospital's attempted lifesaving measures were futile, and Mr. Martin was declared dead at 6:36 p.m.

**Defendants' deliberate indifference and/or negligence killed Mr. Martin.**

226. An autopsy report concluded that Mr. Martin's cause of death was multisystem organ failure with associated metabolic abnormalities due to chronic ethanol abuse with probable alcohol withdrawal.

227. Mr. Martin died because his kidneys deteriorated due to dehydration. It was very clear that Mr. Martin became extraordinarily dehydrated over the course of his detention. Signs of such dehydration included, among other things, a high pulse and becoming progressively confused. It was increasingly obvious throughout his detention that Mr. Martin was not getting sufficient fluids.

228. Individual Medical Defendants recklessly failed to monitor Mr. Martin sufficiently closely, as he needed a much higher degree of evaluation, assessment, and care. For instance, when there is nausea/vomiting in the context of alcohol withdrawal, medical providers need to look for markers of dehydration—like an elevated pulse—to determine if the patient needs IV hydration. Individual Medical Defendants recklessly failed to do so here, when IV hydration was indicated by, among other things, Mr. Martin's fast heart rate.

229. Individual Medical Defendants recklessly refused to contact a higher-level provider and restart the alcohol detox protocol once it became obvious that Mr. Martin was deteriorating. A higher-level provider likely would have ordered close monitoring of Mr.

Martin's fluid intake and if it wasn't sufficient, ordered that he be provided IV fluids or sent to the hospital.

230.    Individual Medical Defendants' fabrication of medication administration also raises an inference that ACDF medical staff recklessly failed to follow appropriate medication and controlled substance procedures, and at worst, the possibility that they were diverting drugs for personal use or sale.

231.    According to the Department of Justice's Bureau of Justice Statistics, approximately 47% of the nation's jail detainees are dependent on alcohol and approximately half were under the influence of alcohol at the time of their offense.

232.    Despite knowledge of these statistics or at the very least of the prevalence of alcohol abuse among inmates and likelihood of withdrawal, Adams County and Wellpath failed to adequately train medical providers and deputies, including Individual Defendants, in how to recognize the symptoms of withdrawal and how to ensure that detainees experiencing acute alcohol withdrawal receive prompt, adequate, and life-saving medical attention.

233.    Had Individual Defendants promptly and appropriately responded to Mr. Martin's serious and obvious medical needs, he more likely than not would have survived.

234.    None of the Individual Defendants nor any other Wellpath or ACDF employee received any discipline or follow-up training related to the death of Mr. Martin, demonstrating the determination by the Institutional Defendants that their agents acted in conformance with the training, policies, and standard operating procedures of each of the Institutional Defendants.

235.    Likewise, despite the unconstitutional delay and indifference in emergency medical treatment for Mr. Martin, no Wellpath or ACDF employee, including Individual Defendants, was disciplined or counseled as a result of Mr. Martin's death.

236.    Adams County and Wellpath trained Individual Defendants to conduct themselves in the manner that they did with respect to Mr. Martin, and these Defendants' actions – and Mr. Martin's death – were pursuant to the training, customs, practices, and policies of Adams County and Wellpath.

**Defendant Adams County fostered a culture in which fabrication of records was accepted and encouraged.**

237.    Three former executive leaders at the Adams County Sheriff's Office who were working in their command staff positions at the time of Carl Martin's detention have been criminally charged in connection with a scheme to falsify official Sherrif's Office records. Former Sheriff Rick Reigenborn, former Undersheriff Tommy McLallen, and former Division Chief Mickey Bethel were arrested in September of 2023 for falsifying attendance records at various training classes they did not attend and then submitting certificates to the Peace Officer Standard and Training (POST) board requesting POST to count these trainings toward their mandatory training hours.

238.    McLallen has pled guilty to the charges of forgery and official misconduct, and he has been sentenced to two years' probation. Reigenborn and Bethel's charges are still pending.

239.    The lack of integrity and proof of fraud from three of the highest positions at the Sheriff's Office reflects a custom of acceptance, and even encouragement, regarding fabricated records within Adams County Sheriff's Office. The criminal charges against the former Adams County leaders shed light on the dangerous and deceitful practice of falsifying records that appears commonplace throughout all of the levels of employment at the Adams County Sheriff's Office.

**Defendants Adams County's and Wellpath's customs, policies, and/or practices of deliberate indifference to inmates' serious medical needs caused Mr. Martin's death and the violation of his constitutional rights.**

240.    At all times relevant to the subject matter of this Complaint, Defendant Adams County contracted with Wellpath to provide medical care and services to detainees at ACDF, as well as medical personnel.

241.    Adams County's use of contracted medical care is customary in the County, and part of a nationwide pattern in the use of private, for-profit, medical companies in providing care in jails, a practice motivated by a desire to cut costs, resulting in exceedingly frequent shoddy and deliberately indifferent care provided to jail detainees.

242.    The use of private companies, and the respective contracts shifting various costs between counties and private companies, encourages cost reduction at the expense of quality medical care, and discourages proper oversight. The for-profit motive contributes significantly to practices, policies, and training that result in deliberately indifferent provision of medical care to serious medical needs of detainee/patients, by disincentivizing jails and their medical providers from providing the necessary staff and resources to evaluate illness, prescribe medications, and oversee effective treatment.

243.    From 2016 to 2018, jails relying on one of the five leading jail healthcare contractors, including Wellpath and its predecessor companies, had higher death rates than facilities where medical services were run by government agencies. Privately run health care providers had death rates that were 18 to 58 percent higher than those of public providers.

244.    Defendants Adams County and Wellpath are part of this nationwide problem and knowingly maintained unconstitutional training, policies and customs by failing to provide higher-level health care in a timely manner.

245.    Defendant Adams County knew that Wellpath, and its predecessor companies, customarily provided inadequate, deliberately indifferent mental health care to inmates and severely understaffed the facilities that they operated within. Despite this knowledge, Defendant Adams County made the affirmative decision to contract and continue contracting with Wellpath to provide health care at the Adams County Detention Facility, with the foreseeable result that inmates would continue to receive unconstitutionally inadequate medical care.

246.    Defendants Adams County and Wellpath maintained constitutionally deficient training, policies and practices and neglected to adequately train and supervise their employees with respect to the proper procedures for the evaluation and treatment of ACDF detainees' and inmates' serious medical needs.

247.    It was well known by the Entity Defendants prior to Mr. Martin's death that there was a widespread pattern and practice of deliberately indifferent medical care at ACDF, as well as other facilities at which Wellpath provided medical services.

248.    The Individual Deputy Defendants' and Medical Defendants' violation of Mr. Martin's Fourteenth Amendment right to be free from deliberate indifference to his medical needs, standing alone, is sufficient evidence of the Entity Defendants' custom, policy, or practice of deliberate indifference because all individual Defendants acted in essentially the same unconstitutional manner, each adhering to what he or she based upon training knew to be standard operating procedure, policy, and customary practice.

249.    The Entity Defendants' policy and/or custom of deliberate indifference and their lack of adequate training, supervision, and discipline regarding meeting the serious medical needs of those in custody at ACDF is further evidenced by an extensive history, including the incidents described below.

250.     In 2011, Bernadette Jaquez died in the Adams County Detention Facility from dehydration connected to withdrawal from opioids. The parallels to the deliberate indifference shown toward Mr. Martin are stark. Upon intake, Ms. Jaquez informed medical staff and Adams County deputies that she was a heroin user. Within days of entering ACDF, Ms. Jaquez began to experience symptoms of withdrawal. She soon suffered a seizure in her cell, which was attributed in jail records to her withdrawal. Also noted in her records was her consistent vomiting and diarrhea. Ms. Jaquez was taken to the hospital, but returned to ACDF after only two hours. Upon her return to ACDF, Ms. Jaquez repeatedly begged correctional and medical staff for help. They ignored her. She pressed the distress button in her cell at least fifteen times on the day she died. The final time she pressed the distress button, two deputies came to her cell door. As they watched Ms. Jaquez, she wobbled and fell to the floor. Instead of entering the cell to check on Ms. Jaquez, the deputies walked away. Two hours later, Ms. Jaquez was dead. The healthcare provider at the time, Prison Health Services ("PHS"), settled with the surviving family members of Ms. Jaquez and admitted liability for her death.

251.     Tyler Tabor was booked into the Adams County Detention Facility on May 14, 2015, in the midst of withdrawal from opioids and benzodiazepines. Later, he would be taken out in a body bag. Over the course of three days, Mr. Tabor's obvious symptoms of life-threatening opioid withdrawal, benzodiazepine withdrawal, and dehydration would manifest themselves on video and in plain view of Deputy Engel and Deputy Brown. In accordance with the policies (and culture) implemented by then Adams County Sheriff McIntosh and other Adams County policymakers along with the jail's private medical provider at the time, Corizon Health, the defendants in that case did nothing to treat Mr. Tabor's obvious, serious medical needs. Defendants' collective deliberate indifference caused Mr. Tabor's death. That case ultimately

settled for a confidential amount.

252.    On July 6, 2017, 40-year-old Randy Luevano was found dead in his cell after

being booked into ACDF the day before. Though Adams County officials redacted all

information about the cause of death in reports provided to Plaintiff's counsel, ACDF staff

plainly failed to identify a deadly threat to Mr. Leuvano's health during the intake process, and

then failed to assess his near-death state on the day he died. The actions of Adams County staff

and policymakers in the death of Mr. Leuvano, which is aptly classified as an "Unattended

Death," is another example of Adams County's deliberate indifference leading to the death of an

inmate.

253.    After Defendant Wellpath was hired by Adams County to provide medical

services to ACDF inmates on December 17, 2019—winning a contract worth nearly $8 million

despite the fact that Wellpath (formerly known as Correct Care Solutions) had been sued over 70

times between 2014 and 2018 for deaths allegedly caused by providing inadequate medical care

to inmates – the substandard medical care in ACDF foreseeably persisted.

254.    On March 10, 2022, just a few weeks before Mr. Martin died, Lindsay Otto was

arrested and taken to the Platte Valley Medical Center (PVMC) to be medically cleared before

being booked at ACDF to serve a DUI sentence. Ms. Otto was diagnosed with jaundice as a

complication of alcohol abuse and had a blood alcohol content of .351. Despite these severe

conditions, she was sent to ACDF and housed in the Medical Unit. Ms. Otto died on March 28,

2022, from alcohol-related complications, only eight days before Mr. Martin died. She was 29

years old when she died. Having presided over Ms. Otto's death in the jail under these

circumstances, all ACDF and Wellpath staff were put on explicit notice of the lethal danger of

severe alcohol-related complications in the mere days before Mr. Martin was booked into ACDF.

255.    In addition to the ACDF-specific incidents described above, because Defendant
Wellpath is a national company with a disgraceful history of failing to provide constitutionally
adequate medical care to inmates at correctional facilities at which it contracts, there is an
abundance of examples nationwide establishing that Wellpath and the entities that employ it
have policies, customs, and practices demonstrating deliberate indifference to the medical needs
and constitutional rights of inmates. Specifically, Wellpath has a dangerous
policy/custom/practice of failing or delaying to provide care from a higher-level provider or to
send inmates for necessary off-site medical care to treat obvious and serious medical conditions.

256.    Wellpath maintains unconstitutional policies and customs that are deliberately
indifferent to inmates' serious medical needs, which have left a trail of deaths and serious
injuries throughout the country. These policies and customs include a pattern of:

- recklessly failing to properly screen and plan for medical and mental health needs
  on intake, and recklessly failing to timely respond to serious changes in condition;

- recklessly failing to hospitalize inmates with obviously serious medical needs
  whose needs they know cannot be met within the jail; and,

- recklessly presuming an inmate is malingering or faking their serious symptoms
  and withholding treatment on that basis.

257.    These local and nationwide unconstitutional policies and practices, often
implemented to maximize profits at the expense of adequate medical care, have caused
substantial neglect and abuse by the company toward inmates and prisoners.

258.    Indeed, a CCS medical director at Richland County's Alvin S. Glenn Detention
Center testified in a 2014 deposition that the company made it clear that employees who "run up

the tab" wouldn't be around very long. He described pressure from both the county and CCS to limit emergency room transfers because of the "severe expense" involved.

259.    A 2020 Reuters investigation of large jails found that patients at institutions using Wellpath and other private providers died at higher rates than at jails with public health care. The investigation found that from 2016 to 2018, for every 10,000 inmates in Wellpath's care, 16 died; in publicly run jails, that rate was 13 per 10,000.[2]

260.    An anonymous jail nurse who worked for CCS at the Brown County jail in Green Bay, Wisconsin, told a reporter in 2017 that CCS discouraged sending inmates to the hospital. This was despite the fact that there was no IV therapy in the jail, which was critical for many withdrawal patients. She said that in order to send a withdrawal patient to the hospital, the inmate would "need to be at the point where their vital signs were dropping, their internal organs were starting to become compromised."[3]

261.    A 2019 report by CNN (on Wellpath's predecessor CCS) concluded that "internal documents and emails, medical records, autopsy reports, audits, interviews with more than 50 current and former employees, and scathing correspondence from government clients show that amid a focus on 'cost containment' and massive corporate growth, [CCS] has provided substandard care that has led to deaths and other serious outcomes that could have been avoided." The report found that "[a]cross the country, the same themes have been found: doctors and nurses have failed to diagnose and monitor life-threatening illnesses and chronic diseases.

---

[2] Susie Neilson, *Its patients are 'literally a captive market.' Is this California health care giant failing them?*, SAN FRANCISCO CHRONICLE (July 25, 2023), https://www.sfchronicle.com/california/article/wellpath-health-care-jails-17917489.php.
[3] Julia Lurie, *Go to Jail. Die from Drug Withdrawal. Welcome to the Criminal Justice System*, MOTHER JONES (February 2017), https://www.motherjones.com/politics/2017/02/opioid-withdrawal-jail-deaths/.

CCS employees have denied urgent emergency room transfers. They have failed to spot or treat

serious psychiatric disorders and have allowed common infections and conditions to become

fatal."[4] Numerous examples of such substandard and unconstitutional care exist. The following

is simply a selection among literally hundreds of examples of horrifying deaths and refusals of

care further evincing Wellpath's unconstitutional policies and practices, under its previous names

and continuing.

262.     Multiple specific incidents of deliberate indifference by Wellpath and its

employees resulted in deaths of detainees caused by alcohol or drug withdrawal.

263.     On March 2, 2015, Jennifer Lobato died as a result of dehydration stemming from

opiate withdrawal-related complications while being detained at Jefferson County Jail. Soon

after entering the jail, Ms. Lobato began demonstrating clear signs of withdrawal from

methadone, including vomiting profusely. Ms. Lobato's symptoms progressively worsened. JCJ

medical staff, including CCS (Wellpath's predecessor company) employees, refused to respond

to provide Ms. Lobato with the medical care she needed. As a result of staff's, including CCS

employees', deliberate indifference to her medical needs, Ms. Lobato died alone in her cell. Ms.

Lobato's estate filed suit against several individual defendants, as well as Jefferson County and

CCS. Jefferson County and the deputy defendants settled with Ms. Lobato's estate for $2.5

million prior to trial and claims against the CCS Defendants settled for a confidential amount.

264.     On March 28, 2019, John Kowalski died from complications of opiate withdrawal

due to Jefferson County Jail (JCJ) and Wellpath staff's deliberate indifference to his serious

medical needs, while he was a pre-trial detainee at the JCJ. While in custody, Mr. Kowalski,

---

[4] Blake Ellis and Melanie Hicken, *A CNN investigation exposes preventable deaths and
dangerous care in jails and prisons across the country*, CNN (June 2016),
https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/.

suffering from opiate withdrawal, passed out and had a seizure in the shower. Mr. Kowalski's conditions were communicated to JCJ staff and Wellpath medical personnel responsible for caring for Kowalski. However, JCJ and Wellpath staff did not provide adequate medical care nor life-preserving checkups on his condition. As a result, he became gravely ill and went into cardiac arrest. He died a week later at the hospital.

265.    On June 3, 2013, Tanya Martinez, died alone in a lockdown jail cell at Pueblo County Detention Facility from an alcohol withdrawal related seizure at the age of thirty-six. Ms. Martinez's preventable death occurred after she displayed obvious signs of withdrawal, including shaking, nausea, vomiting, sweating, and rapid pulse. Among other acts and omissions of deliberate indifference, jail and CHC (a CCS related company) medical staff failed to regularly monitor Ms. Martinez's condition, unconscionably delayed giving her medication, provided insufficient medication, failed to transport her to a hospital despite her obvious need for emergent care, and, just minutes before her death, ignored a call for medical to check on her.

266.    On March 16, 2022, Laura Gibbs told El Paso County deputies that she was not feeling well and having panic attacks. Deputies told Wellpath medical staff and the Chemical Dependency nurse said she would see her. Later that day, deputies again told medical that Ms. Gibbs was not feeling well, but medical refused to come. Later again on the 16th, deputies called medical a third time and she was finally seen. Her problems continued into the morning of March 17th. At approximately 9:00 a.m., when the nurses came to her unit to pass out medications, deputies asked them to see Ms. Gibbs. She told medical that she was withdrawing from heroin and was experiencing nausea, diarrhea, the shakes, and was hot and cold. Medical staff merely responded that they would make note of her problems and would come back to see her. Medical did not come back or provide any medication to address Ms. Gibbs' worsening

condition even though all jail staff know these withdrawal symptoms can be fatal in drug users if not treated. Predictably, later that day at 2:17 p.m. on March 17th, Ms. Gibbs was found unresponsive and declared dead shortly thereafter—a death that would not have occurred but for Wellpath's employees' deliberate indifference.

267.    Daniel Murray died of alcohol related conditions and withdrawal seizures while incarcerated at El Paso County Jail in July of 2022. While he was in "chem dep," which is how the jail staff often refer to the medical's Chemical Dependency plans for withdrawal, he had a sharp mental decline and was ranting incoherently and hallucinating. Mr. Murray supposedly "refused" medication, although he was not competent then to do so given his mental state. Despite obvious inability to consensually refuse medication, and his declining condition, Wellpath medical staff treated Mr. Murray as "refusing" and just being "in a mood," and refused to provide him any treatment. Deputies noticed shallow breathing and Mr. Murray told staff that he was having a seizure. Mr. Murray's alcohol withdrawal needs were recklessly under-assessed, and then medical staff ignored his obvious change in condition and active decompensation until he died.

268.    On December 11, 2022, 24-year-old Savannah Poppell was found barely responsive in her cell at El Paso County Jail surrounded by copious amounts of vomit that looked like coffee-grounds – a telltale sign of internal bleeding. The dark vomit was on the floor, the walls, her bed, and all over her face. Ms. Poppell was withdrawing from opiates, which all medical staff know frequently involves significant vomiting and needs to be properly managed as it is potentially fatal. She was also a Type 1 diabetic and her insulin was totally unmanaged by Wellpath medical staff even in the very dangerous context of repeated vomiting of blood. Near the time of her death she was extremely hyperglycemic. The coroner concluded Ms. Poppell

experienced such violent and prolonged vomiting from substance abuse withdrawal that she tore

her esophagus, suffered a fatal upper gastrointestinal hemorrhage and bled to death at the jail—

all due to Wellpath medical staff's deliberate indifference to her serious medical needs.

269.    In June of 2014, David Stojcevski, 32, died from drug withdrawal symptoms after

spending 16 days at Michigan's Macomb County jail. When he was booked for his 30-day

sentence, Mr. Stojcevski informed Correct Care Solutions (now Wellpath) staff that he was in the

process of treating his drug addiction and that he was taking methadone, benzodiazepines, and

other opiate medication. However, jail and Wellpath staff were deliberately indifferent to Mr.

Stojcevski's critical need for ongoing medication and care while withdrawing from drugs. Much

like Mr. Martin's case, staff placed him in a "high observation" cell where they noticed his

bizarre behavior indicative of severe withdrawal symptoms but were indifferent to his serious

medical needs, including his obvious inability to obtain adequate nutrition or hydration. Mr.

Stojcevski lost 44 pounds over 16 days and died on the floor, naked and starving, much like Mr.

Martin. Mr. Stojcevski's family sued, and Wellpath settled its part of the lawsuit for $1.3 million.

270.    In January 2018, Wellpath providers were deliberately indifferent to the serious

medical needs of Kathleen Norman, causing her death. Ms. Norman was suffering the effects of

alcohol detoxification while in custody at the Yamhill County Jail in Oregon. When she was

admitted to the jail, Wellpath staff were aware of her condition and placed her in a medical cell

on a detoxification protocol. Despite supposed medical monitoring, Wellpath staff allowed Ms.

Norman to fall off her bed and lie face-down on the ground, alone, for an extended period of

time, resulting in her death.

271.    Wellpath's deliberate indifference caused the in-custody death of Paul Bulthouse,

age 39, in April 2019. Mr. Bulthouse died at the Muskegon County Jail after he suffered 15

seizures over a period of less than four hours due to alcohol and benzodiazepine detoxification. Mr. Bulthouse's severe symptoms, including hallucinations as well as seizures, were deliberately ignored and untreated by Wellpath staff. As with Mr. Martin, Wellpath staff failed to send Mr. Bulthouse to a higher-level provider despite the obviously severe symptoms of detoxification, and Mr. Bulthouse died alone in his cell.

272.    In addition to the incidents above related to alcohol and drug withdrawal, Wellpath and its employees were responsible for many other instances of harm caused by deliberate indifference to detainees suffering from other medical conditions.

273.    For example, in 2013, a multiple plaintiff case was filed against CHC-related companies arising out of three deaths and one near death in the Tulsa County Jail resulting from inadequate medical care and refusals to obtain needed outpatient and emergent services for prisoners (*Revilla v. Stanley Glanz, Sheriff of Tulsa County, et al*., Case No. 4:13-cv-00315-JED-TLW (N.D. Okla.)). One plaintiff died due to bowel perforation and sepsis after medical staff refused to transport him to the hospital despite escalating and serious symptoms. Another detainee died from a heart attack after complaints of chest pain were ignored for days without emergency transport. A third detainee, who had a known history of cardiovascular problems, died after complaints of pain, nausea, and vomiting were ignored and emergency transportation, was denied.  The incidents were caused by a longstanding policy, practice, or custom at the jail of Wellpath's predecessor companies (CCS, CHC, etc.) refusing to provide higher-level care or to send inmates with emergent needs to the hospital for purely financial purposes.

274.    In 2015, Scott Millward died in the Teton County, Wyoming jail where the medical care was provided by CCS. Mr. Millward was in the throes of a medical crisis from alcohol intoxication and withdrawal and also had persistent and critically high blood pressure.

Despite this crisis and abnormal vital signs, CCS staff ignored abnormal vitals, did not take other required vitals, and did not administer Mr. Millward his required medications or gave him insufficient doses. CCS did not take efforts to send Mr. Millward to the hospital, which was only minutes away. Mr. Millward appeared in court where the judge noted that he did not look well. Staff continued to fail to take his vitals and Mr. Millward finally died in his cell. Mr. Millward's autopsy concluded that he died of cardiovascular disease, including hypertension, and that "lack of antecedent medical care" was a contributing factor in his death. Mr. Millward was basically warehoused by CCS staff; he was not administered needed medication, he was not worked up despite serious symptoms and complaints, and instead he was left to die in his cell.

275.    Earl Williams died at the Tulsa County Jail in 2011 after he was known to have gone days without food or water. Mr. Williams' serious and known medical needs were ignored by CHC medical staff because there was an inappropriate "faking or malingering" diagnosis that prevented him from receiving timely hospital care. Expressly concluding that he was faking paralysis, despite an injury to his head causing partial paralysis, the CHC nurses recklessly ignored Mr. Williams deteriorating and dehydrated status. Before he died, staff threw food at Mr. Williams and put water just outside his reach. Mr. Williams begged for water as he laid on the floor of his cell covered in his own waste. Mr. Williams' death was caused by CHC-related defendants' maintaining a policy, practice, and/or custom of severely limiting the use of off-site medical, mental health and diagnostic service providers, even in emergent situations, in deliberate disregard to the known, obvious, and excessive risks to the health and safety of inmates. A lawsuit based on Mr. Williams' death resulted in a pretrial settlement against CHC (a predecessor or Wellpath) and jury verdict against the County in the amount of $10.25 million, which was affirmed on appeal to the Tenth Circuit Court of Appeals, *See Burke v. Regalado*, 935

F.3d 960 (10th Cir. 2019), and was then settled for $10 million against the County in addition to the separate pretrial settlement paid by CHC.

276.    Another death at Tulsa County Jail, that of Gwendolyn Young, who died in 2013, resulted in an $82 million verdict against CHC after a jury found that it violated Ms. Young's civil rights. Ms. Young, who was in the jail for about five months before her death, frequently complained to CHC staff that she needed to go to a hospital. Two days before her death, she told staff she had been throwing up blood. Minutes before she died, she told a nurse she was having difficulty breathing and asked to go to the hospital. The nurse refused. The jury correctly found that Ms. Young's death was caused by CHC's deliberate indifference to her medical needs. From 2005 to 2014, while CHC was the healthcare provider at Tulsa County Jail, 28 deaths occurred at the jail. CHC's failure to take measures to address known deficiencies in its provision of medical care at the jail before Ms. Young's death contributed to the verdict.

277.    CHC-related entities at the Tulsa Jails had previously been subject to the following high-level reports of constitutional deficiencies:

      a.    In 2007, the National Commission on Correctional Health Care ("NCCHC") auditors reported serious and systemic deficiencies in the care provided to prisoners by CHC related companies in the Tulsa jail, including failure to triage sick calls and failure to address health needs in a timely manner."

      b.    In 2008, the Department of Justice found that the jail medical program, administered by a CHC related entity, was constitutionally deficient in a number of regards. Specifically, among other things, the DOJ found that there were "critical lapses in getting emergency medical care to detainees." DOJ also noted that they had conducted a previous tour in 2003 and that, despite many years to

remedy the violations found, "[it] generally did not observe improved conditions at the time of the second tour."

c.  In 2009, an Oklahoma Department of Health investigation indicated that such deficiencies continued unabated by CHC-related companies despite the abundant notice of the same from NCCHC and DOJ.

d.  In a 2010 NCCHC audit, NCCHC found deficient care, deficient investigation into deaths, and lack of timely diagnostic and specialty services.  Even after this audit, CHC did not follow the corrective action plans, and did not take the corrective measures necessary to alleviate the obvious and substantial risks to inmate health identified, despite high-level CHC workers repeatedly bringing to corporate CHC attention the many serious deficiencies, including chronic failures to triage medical requests, falsification of records, and refusals to treat inmates with life-threatening conditions.

e.  In November 2011, the jail's own retained auditor found the same or substantially similar deficiencies in care.

f.  In 2011, U.S. Immigration and Customs Enforcement and the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") also conducted a review of the medical care provided by CHC and related companies and reported that it had found a prevailing attitude among clinic staff of indifference, and nurses were undertrained and there was a high frequency of failure to evaluate patients properly.

278.  The Tulsa jail medical care and policies and practices were overseen by the same high-level corporate executives and their successors as those overseeing Wellpath programs at

other detention centers, including the Adams County Jail, at which the same unconstitutional policies, customs, and practices were instituted, leading to similar constitutional violations.

279.    Eighteen-year-old Marc Moreno died in 2016 in Benton County Jail (Oregon) after CCS medical staff unconstitutionally denied him medical care despite his alarming, emergent symptoms. Mr. Moreno was suffering from a known mental health crisis when he was detained, and he was observed by jail staff not eating or drinking for days. When a CCS nurse at the jail observed him, knowing that he had not had food or drink for four days at that point, she not only failed to contact a provider or send him off-site for emergency treatment, she also did not even take his vital signs. The next day, he was found dead in his cell; he had lost 38 pounds in the 8 days he had been detained – very similar to Individual Defendants' refusal to monitor Mr. Martin's food or water intake despite his known withdrawal condition and his stated suicidal intent. After Mr. Moreno's family sued CCS, a court found that CCS had destroyed thousands of potentially incriminating documents in the case before they could be produced. Wellpath settled the lawsuit for $4.5 million.

280.    58-year-old Randall Johnson died in the Shasta County Jail in 2018 due to Wellpath's and its staff's deliberate indifference to his known medical needs. Mr. Johnson had attempted to kill himself by overdosing on methamphetamine. He was sent to the jail instead of the hospital. At the jail, he was speaking incoherently, screaming in pain, and vomiting. He had elevated vital signs. A Wellpath nurse falsified his medical intake form to cover up that he was experiencing a medical emergency. Despite their knowledge of his methamphetamine intoxication and obvious need for emergency medical attention, Wellpath staff at the jail admitted Mr. Johnson to the jail rather than allow him to go to the hospital. Over the next 36 hours, Mr. Johnson's condition deteriorated until he died, with several Wellpath nurses refusing

to send him to the hospital despite his obvious and serious need to be sent out for emergent care. A lawsuit based on Mr. Johnson's death was settled for $12.75 million, with Wellpath and one of its employees paying $11.1 million due to their deliberate indifference.

281.    Henry Clay Stewart died a preventable death from a perforated ulcer at Hampton Roads Regional Jail in Virginia in 2016 after seeking medical assistance from CCS medical staff for almost a month. He reported abdominal pain, blackouts, and inability to keep down food or water. Despite his persistent, concerning symptoms, CCS medical staff acted with deliberate indifference to his serious medical needs by refusing to send him off-site for care. A Department of Justice investigation found that there was reasonable cause to believe that the jail failed to provide inmates with constitutionally adequate medical care, citing Mr. Stewart's death, among several other deaths from lack of insufficient medical care, as evidence of its finding. The DOJ found that before Mr. Stewart slowly bled to death, medical staff ignored his complaints because they determined that he had already been seen at the hospital.

282.    Alisant Scott lost her breast to a mastectomy in 2016 after being detained in Oakland County Jail (Michigan), where CCS medical staff denied her obviously necessary evaluation and treatment in response to her complaints of agonizing pain due to a knot in her breast growing to the size of a baseball. Ms. Scott was prescribed a basic antibiotic that medical records show did little to combat a dangerous MRSA infection inside her breast; she pleaded with medical staff for help for two weeks before being forced to undergo the mastectomy, and the unconstitutional delay in adequate care and treatment was likely the reason she lost her breast and suffered weeks of excruciating pain.

283.    In 2016, 59-year-old Paul Clifton Jr. died in an Illinois jail after a jail sergeant who was about to call an ambulance for him due to his difficulty breathing was told wrongly by

CCS employees that his condition had improved and that it was unnecessary to send him out.

Even though Mr. Clifton's blood pressure remained dangerously high and he complained of

chest pains, CCS staff refused to call an ambulance until he was unresponsive. Mr. Clifton's

death was caused by CCS medical staff's deliberate indifference to his obvious and serious

medical needs, as well as CCS's policy, custom, and/or practice of not or delaying in obtaining

obviously necessary off-site care for inmates with serious medical conditions.

284.    Jeffrey Lillis died at 37 years old at the Arapahoe County Detention Facility on

December 14, 2014, as a result of deliberate indifference to his known serious medical needs by,

among others, a CCS/CHC/CHM-contracted physician (CCS, CHC, and CHM are all Wellpath

predecessor companies). Mr. Lillis died of sepsis and severe bacterial pneumonia, easily

treatable conditions that would not have killed him had he been provided proper and timely

medical attention and treatment. Yet despite learning of the serious nature of his symptoms, the

physician failed to timely order that Mr. Lillis be transported off-site for the necessary medical

evaluations and care, leading (among other actions by jail medical staff) to Mr. Lillis's death.

The state medical board later found that the doctor had acted below generally accepted standards

of practice. A claim against the physician and CCS/CHC/CHM was settled by CCS/CHC/CHM

for a confidential amount.

285.    In August of 2014, CHC-related defendants unconstitutionally caused the death of

John Patrick Walter at the Fremont County Detention Center in Colorado by ignoring his

obvious and serious medical condition. Much like Mr. Martin's case, Mr. Walter's case involved

staff deliberately disregarding his obvious malnourishment and dehydration and withdrawal

related conditions due to the jail's and CHC's denial of the prescription medication he had been

taking before he was detained, and the reckless refusal to transport him to the hospital for

necessary emergency treatment. He died on the floor of his cell, weighing 30 pounds less than when he was brought to the jail three weeks earlier. CCS and its related entities settled a lawsuit based on Mr. Walter's death for $4.25 million.

286.    On December 14, 2014, a Colorado federal jury awarded an over $11 million dollar verdict against Wellpath predecessor company CHC and other defendants for failing to provide timely medical care to inmate Ken McGill in Jefferson County who was having a stroke. Nurses recklessly disregarded Mr. McGill's obvious and serious symptoms as not real, did not call a doctor, did not send him to a hospital for appropriate care, and instead abandoned Mr. McGill while in the throes of a stroke for hours. The jury found that this company had a pattern and practice of not providing timely medical care and allowing nurses to practice outside their scope in treating inmates, awarding millions of dollars in punitive damages for these deliberately indifferent customs and policies.

287.    In April of 2014, Thomas Beauford died at Mesa County Detention Facility due to deliberate indifference to his obvious and serious medical needs by CCS (or related companies). Throughout his time at the jail, Mr. Beauford demonstrated clear signs of epilepsy. Because of the failure to provide him adequate care, Mr. Beauford's condition rapidly deteriorated on April 15, 2014, into the morning of April 16, 2014. Though Mr. Beauford's need for immediate medical attention was obvious, at no time was he provided with medical attention or treatment. Alone in his cell, Mr. Beauford ultimately had a series of seizures, fell off his bed, and died with his head jammed underneath his desk. Mr. Beauford's death could have been prevented had jail medical staff and detention personnel provided him (or arranged to provide to him) with prompt and appropriate medical attention and treatment.

288.     An investigation into David Courtney's 2014 death after his detention in Montgomery County Jail, where CCS was the medical care provider, resulted in the Texas Commission on Jail Standards finding that the jail did not meet minimum standards. The conclusion was based in part on the fact that Mr. Courtney received clearly unconstitutional care when CCS waited nearly two months to send him to see a doctor despite at least four notes in his chart about blood in his stool.

289.     In 2012, CCS medical staff ignored Nicole Guerrero's obvious signs of labor and left her unattended in a solitary cell in Wichita County Jail. CCS staff recklessly failed to transport her to the hospital for safe delivery of her child. When delivered, the baby was purplish and in need of medical attention, yet CCS staff did not take steps to resuscitate the newborn or administer CPR. The baby was pronounced dead shortly after birth.

290.     In 2009, Charles Holdstock died after the medical staff of a CCS-related company at Oklahoma County Jail ignored lab results that Mr. Holdstock's kidneys were not functioning properly (and were failing to eliminate the toxic build-up of his heart medication). Instead, jail medical providers acted with deliberate indifference by waiting to take Mr. Holdstock to the hospital despite the alarming test results and related symptoms. Mr. Holdstock was found unresponsive on his cell floor and later died in a hospital emergency room.

291.     On September 27, 2021, William Johnson suffered a fatal seizure in the El Paso County jail after spending a month pleading to receive the prescription medications that he brought to the jail with his PCP's current orders and letters warning of the dangers of withdrawal if his medications were not provided. Wellpath staff conducted a cursory intake assessment, and then abruptly discontinued four of Mr. Johnson's necessary mental health and anti-seizure prescriptions with no medical basis, and without consulting with his prescribing PCP. Without

his medications, Mr. Johnson decompensated, became severely anxious, could not sleep, lost touch with reality, and suffered a complete mental breakdown. Instead of helping him, he was punitively placed in solitary confinement where he continued not to receive his medications, including those for seizure prevention. Although Mr. Johnson had a known, major unexplained change in mental status and was severely incapacitated, he was not sent to the hospital. He spent the last week of his life disoriented, alone, and begging for medications, before dying of a seizure in solitary confinement.

292.    On February 14, 2022, 32-year-old Sean Williams was in El Paso County Jail when deputies saw him to be "physically unwell." He was naked and emaciated, not responding to verbal commands, and there were feces scattered on the floor. He struggled to sit up and had to be helped into a wheelchair. Deputies decided that he needed to go to medical immediately. Deputies told the Wellpath Charge Nurse that Williams had not eaten or drank much (if anything) for days. The Charge Nurse said that he was "experiencing an episode of psychosis," but did not evaluate him. Deputies decided to keep him in medical until he was actually evaluated. Over the next hours deputies repeatedly found Mr. William still sitting in medical, waiting to be evaluated. On one such occasion, a deputy noted that "[m]ultiple medical staff walked over Inmate Williams. He made sounds of distress while he laid on the floor." Deputies returned him to his wheelchair. When deputies asked medical about him, they said "just so you know, he's psychotic." Later that same day, deputies saw on the video feed of the medical unit that Mr. Williams was back on the floor with "medical staff standing at the charge desk approximately 6 feet from Inmate Williams" with "no one evaluating" him." Mr. Williams became progressively worse while medical staff ignored him. Medical told deputies on multiple occasions that his medical crisis was not real and "behavioral," meaning "a choice that someone

engages in" rather than an actual "medical condition." On one of the times, he slipped out of his wheelchair, too weak to hold himself up, the Charge Nurse said "[h]e's fine. It's behavioral. Just leave him there. If anything, it's better than him sliding in and out of the wheelchair." Deputies returned to medical to help him and found him with mucus and spit all over his face – they demanded that nurses take his vitals. EMT Patterson was not able to get vitals and left to get different equipment. Due to Wellpath staff's deliberate indifference, Mr. Williams died on February 15, 2022, of lymphocytic encephalitis, only 22 days after being booked into the jail on charges of trespass and shoplifting.

293.    Cristo Canett died a gruesome, painful, and entirely preventable death while incarcerated in the El Paso County Jail. Mr. Canett took himself to the emergency room because of his severe back and flank pain. He was recklessly arrested at the hospital after he was triaged and waiting to be taken back to see the nurses and doctor. When Mr. Canett arrived at the El Paso County Jail, without having been medically evaluated at the ER, his pain had grown worse, spreading to his abdomen and right shoulder. Mr. Canett told Wellpath nurses at the jail about his new emergency symptoms of abdominal and shoulder pain, asking to see a nurse and doctor. Mr. Canett's pain became so bad he needed a wheelchair. He was pale, clammy, had labored breathing, shortness of breath, and was in obvious severe pain and medical distress. Deputies called the jail medical unit for help several times, but Wellpath staff did nothing in response. They did not send him to the hospital where they knew he had tried to go the day before when he was arrested. They did not even call a doctor to report these abnormal symptoms. No nurse or doctor ever assessed or treated Mr. Canett at the jail. Mr. Canett was suffering from a duodenal ulcer, which finally perforated early in the morning on April 26, 2022, causing him to internally

bleed to death on the floor of his cell. Wellpath and its staff's deliberate indifference to his medical needs caused his death.

294.    Adison Reed was booked into the El Paso County Jail on September 3, 2021. Wellpath staff were aware that Mr. Reed was diabetic based on a previous incarceration but deprived him of necessary diabetic care and treatment. By September 8, Mr. Reed was in extreme diabetic ketoacidosis, a life-threatening condition that results from a lack of insulin. He was finally transported to the hospital, and died 19 days later, on September 27, 2021. Wellpath was deliberately indifferent in Mr. Reed's intake screening and care planning. Staff then allowed his medical condition to devolve to the point of extreme diabetic ketoacidosis as part of their pattern of refusing to respond to obviously critical changes in medical condition until the person is dead.

295.    In June 2022, 18-year-old Dezeree Archuleta died from suicide at El Paso County Jail after repeated worsening of her mental health condition was recklessly not responded to and Wellpath staff repeatedly refused to send her for obviously needed higher level care. Ms. Archuleta had a well-documented history of mental health issues, including major depressive disorder and post-traumatic stress disorder. Despite ongoing, obvious and well-known signs of suicidality, Ms. Archuleta was taken off suicide watch. Over the course of her incarceration, Ms. Archuleta's situation deteriorated, and she relayed suicidal ideation, visual hallucinations, self-harm, and requested medications to help with her depression. Wellpath staff merely responded that she should try to take her mind off things. Even after she was found naked and punching herself in the face, this known worsening of her condition did not prompt Wellpath to transfer her to a hospital or advanced level psychiatric care. Ms. Archuleta asked Wellpath mental health staff to keep her on suicide watch as she was continuing to have self-harming thoughts, but on

June 8th, staff removed Ms. Archuleta from watch. The next day, Ms. Archuleta was noted to

have a blunted affect and change in her presentation -- she told staff she was suicidal, but again

was not transferred or provided any higher-level mental health care. She was callously told to

simply "use her coping skills." Ms. Archuleta was found dead hanging from a vent grate by a

torn strip of clothing in her single-cell later that day.

296.    On July 3, 2022, Cassandra Ramirez died from drug related issues in the El Paso

County Jail. That day, she had been "chem depping pretty aggressively throughout the day and

she was needing a new jumpsuit and blankets," which means that Ms. Ramirez's symptoms had

caused her to urinate and defecate on herself. Wellpath medical staff recklessly refused to

address these serious obvious symptoms, leaving Ms. Ramirez to die near midnight on July 3,

2022.

297.    After several in-custody deaths at the San Luis Obispo County Jail, the

Department of Justice investigated Wellpath's medical and mental health care. One of these

deaths involved a man who did not get a comprehensive medical screening when he entered

custody, did not get any tests or laboratory examinations, and who was not otherwise monitored

by staff while having symptoms of a heart attack. Instead, they improperly gave him high doses

of Ibuprofen, a drug the FDA has warned can lead to heart attacks in people with high blood

pressure. On the morning of his death, the man complained of left shoulder and arm pain,

numbness and tingling, clamminess, and left sided chest pain. Consistent with Wellpath's

unconstitutional practices, staff refused his requests to be sent to the hospital, and he died of a

heart attack in the jail.

298.    The DOJ found that Wellpath's systemic issues caused constitutional violations at

the San Luis Obispo County Jail. Specifically, the DOJ found that "[t]he Jail has failed to

provide a medical screening system that ensures adequate diagnosis and treatment of serious

medical conditions and continuity of care; has failed to ensure access to care for prisoners who

report medical problems; and has failed to deliver an acceptable quality of care in several

areas…." The DOJ further found that the jail "fails to provide constitutionally adequate medical

care to prisoners" and that it "does not timely evaluate or treat prisoners who request medical

attention."

299.    In 2018, James Jarvis, a 60-year-old man, was incarcerated at the Mesa County

Jail with current prescription medications for hypertension. Mr. Jarvis was denied his prescribed

medication by CCS medical staff, and he became seriously ill in about a week. After days of

vomiting, dizziness, and stumbling when he tried to walk, Mr. Jarvis complained to a nurse and

was just told to put in a kite. His condition continued to deteriorate in front of the nurses' eyes,

so much so that he could no longer move without assistance. This was captured on video and

reported to staff repeatedly. But for many days, multiple nurses on multiple shifts, refused to

send him to a hospital or even call a doctor. An LPN saw Mr. Jarvis five days after he submitted

a kite, by which time he could not walk and the left side of his face felt rubbery. Yet this LPN

sent him back to his cell without performing any assessment and without contacting a higher-

level nurse or doctor. Mr. Jarvis had suffered a stroke, and despite his obvious presentation of the

classic symptomology of such a serious medical emergency, he was forced to wait for a

scheduled appointment with an NP before an ambulance was finally called. This delay caused

permanent injuries.

300.    In April 2017, Denny Lovern died of a heart attack at the Arapahoe County

Detention Facility after CCS nursing staff recklessly ignored his obvious emergency symptoms

in the days leading up to his death. Despite Mr. Lovern's known history of cardiac issues and his

prescription heart medication Plavix, CCS nurses failed to give Mr. Lovern his Plavix because the jail did not have any and they failed to promptly secure a supply. CCS nurses then ignored Mr. Lovern's reports of chest pains, presuming he was malingering, and "treated" this chest pain with an over-the-counter antacid. Despite repeated requests for help, Mr. Lovern's obvious and treatable cardiac emergency went untreated. He was never sent to the hospital, and he died on the floor of his cell. He was 59 years old.

301.    Marc Moreno died of died of dehydration in the Benton County Jail in Washington State at just 18 years old due to CCS and its staff's deliberate indifference to his medical needs. Marc Moreno entered the jail in a mental health crisis and was put in a "safety cell," a very small padded isolation cell with no natural light and 24-hour-a-day illumination by overhead lamp. There was no access to water in this isolation cell except through staff. A jail social worker witnessed Mr. Moreno's obvious deterioration – including his playing with his own feces inside the cell – and his failure to eat or drink, so she referred him to CCS staff. Despite knowing that Mr. Moreno had not consumed any fluids or nutrition for at least two days, medical staff waited two days before even responding to the referral. When a CCS nurse finally did observe Mr. Moreno through his cell window, she saw him lying naked on the floor face down. She took no vital signs. She did not take a urine sample, weigh the young man, or take any other steps to assess the severity of his dehydration. This nurse also looked at a food/fluid log for Mr. Moreno, which did not report any food or fluid intake for an additional two days. Despite observing Mr. Moreno in an obviously deteriorated state, and despite knowing that he had not consumed any fluids for at least four days, this nurse left Mr. Moreno to fend for himself. She did not return. Due to CCS staff's deliberate indifference to his serious medical needs, Mr.

Moreno died of dehydration caused by prolonged fluid deprivation, lying naked and face down on the floor of his isolation cell, with feces and trash strewn about him.

302.    A common thread in these cases is that Wellpath and its predecessor companies ignored obvious signs and symptoms to deny inmates access to necessary higher-level or offsite medical care, which is exactly what happened to Mr. Martin.

303.    Defendant Adams County, in contracting with Wellpath to provide medical care at the ACDF, knew or should have known of Wellpath's significant history and pattern of serious deficiencies in providing medical services and care to detention facility inmates, and refusals by Wellpath to correct such deliberately indifferent policies, practices, and customs. Defendant Adams County is liable for the selection and years-long retention of Wellpath to provide medical services at ACDF despite such knowledge, which demonstrated shocking indifference to the health and safety of ACDF inmates in its jail given what it knew to be a history of unconstitutionally inadequate medical care in correctional and detention facilities.

304.    Defendant Adams County had a non-delegable duty to provide constitutionally sufficient medical care to inmates and detainees, which it violated when ACDF and Wellpath medical staff did not provide Mr. Martin the timely higher-level or offsite care that he needed to treat his serious medical condition and no one at the County ensured such adequate medical care either.

305.    Defendant Adams County intentionally delegated final policy making authority related to the provision of medical care in its jail to a third party—namely, Wellpath and its related entities.

306.    Defendant Adams County is liable for the unconstitutional actions of Defendant Wellpath (including its defective customs, policies, and practices described herein that were the

moving force behind the violations of Mr. Martin's constitutional rights) and its employees or contractors toward Mr. Martin.

307.    Based on the numerous incidents detailed above of constitutionally deficient medical care and treatment provided by one or both of the Entity Defendants, and the absence of accountability and adequate training and supervision, the Entity Defendants knew or should have known that ACDF medical staff would display deliberate indifference to the serious medical needs of ACDF inmates, including but not limited to the failure to obtain timely necessary off-site care for obvious and serious medical conditions.

308.    Further, Adams County and/or Wellpath's deliberately indifferent policy, custom, and/or practice of failing to discipline, and thereby condoning, encouraging, training, tolerating, rewarding and ratifying such deliberate indifference, has resulted in a custom or culture of inadequate medical care at ACDF because Adams County and/or Wellpath has explicitly or implicitly communicated to staff, including Individual Defendants, that such lack of care is authorized and, indeed, expected, and when used will be defended by the supervisory and municipal apparatus of Adams County and/or Wellpath.

309.    The approval and defense by Adams County and/or Wellpath of deliberate indifference by ACDF medical staff sends a clear and unequivocal message to those employees—it *trains* them—that such deliberate indifference is acceptable, consistent with policy, and is approved practice, causing it to be likely or even inevitable in the future.

310.    In light of their knowledge of constitutionally deficient care, the Entity Defendants could have and should have changed their policies and/or pursued reasonable methods for training, supervising, and disciplining ACDF staff regarding meeting the serious

medical needs of ACDF inmates, but the Entity Defendants made a conscious and deliberate choice not to do so.

311.     The Entity Defendants' unlawful conduct regarding their deliberate indifference in meeting the serious medical needs of inmates constitutes a custom and widespread practice so pervasive and well-established as to constitute a custom or usage with the force of law.

312.     The Entity Defendants' failure to discipline or counsel any of the Individual Defendants or for their deliberate indifference to Mr. Martin's serious medical needs demonstrates that their conduct was carried out *pursuant to* the customs, policies, practices, and regiment of training of Adams County and/or Wellpath, and that such conduct is customary with Adams County and/or Wellpath. Had such conduct not been customary and pursuant to approved policy, the Entity Defendants would have taken disciplinary or ameliorative action, which they did not.

313.     Because the Entity Defendants created, tolerated and, at times, encouraged a custom of deliberate indifference to inmates' serious medical needs and continuously failed, despite the obvious need to do so, to adequately train, discipline, and supervise staff in this area, individuals including Mr. Martin have repeatedly been subjected to violations of their constitutional rights.

314.     The Entity Defendants knew or should have known that their acts or omissions in failing to provide adequate medical care to meet the serious needs of inmates were substantially certain to cause ACDF staff (including Wellpath employees or contractors) to violate individuals' constitutional rights, and the Entity Defendants consciously or deliberately chose to deliberately disregard this obvious risk of harm in adhering to their policies and/or customs of, among other things, failing to provide additional or better training and supervision to ACDF staff

regarding meeting inmates' serious medical needs, including but not limited to the need to obtain timely higher level or off-site care for serious medical conditions.

315.    The Entity Defendants were deliberately indifferent to Mr. Martin's constitutional rights because they knew that individuals in Mr. Martin's position would be at substantial risk of suffering dangerous consequences from, among other things, their failure to adequately train and supervise ACDF staff in meeting the serious medical needs of inmates, yet they failed to take adequate action to rectify this deficiency.

316.    The circumstances attendant to Mr. Martin's detention and health crisis are foreseeable in the jail setting, sufficiently recurring as to place the Entity Defendants on clear notice that training, policies, and practices must be developed and enforced to avoid the violation of the constitutional rights of detainees who may be incarcerated at ACDF.

317.    The need for such training and the probability that the failure to provide such training would cause an ACDF inmate like Mr. Martin to be seriously injured or to die was so obvious that Entity Defendants' failure to do so constituted deliberate indifference to Mr. Martin's serious medical needs.

318.    Mr. Martin's death was the result of longstanding, known systemic deficiencies in the medical care provided to inmates by the Entity Defendants, and the Entity Defendants' unconstitutional policies, customs, or practices described above regarding providing medical care to inmates were the moving force and proximate cause of Individual Defendants' violating Mr. Martin's constitutional right to be free from deliberate indifference to his serious medical needs.

319.    The Entity Defendants' deliberate indifference to his serious medical needs caused Mr. Martin and his family substantial damages.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### 14th Amendment – Failure to Provide Adequate Medical Care and Treatment
### (By the Estate of Carl Martin Against All Defendants)

320.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

321.    At all times relevant to the allegations in this Complaint, Defendants acted or failed to act under color of state law.

322.    At all relevant times, the described conduct of the Individual Defendants was taken within the course and scope of their official duties and employment.

323.    At all relevant times, Mr. Martin was a pretrial detainee subject to the protections of the Fourteenth Amendment to the United States Constitution.

324.    Mr. Martin had a clearly established right under the Fourteenth Amendment to be free from deliberate indifference to his known serious medical needs and to receive adequate medical care while in the custody of Adams County.

325.    Each Individual Defendant knew or should have known of these clearly established rights at the time of Mr. Martin's arrival at ACDF.

326.    Defendants violated the clearly established constitutional rights of Mr. Martin.

327.    Mr. Martin was in obvious and serious need of medical care and treatment upon his arrival at ACDF. Individual Defendants failed to provide such medical care, and instead engaged in (or allowed others to engage in) deliberate indifference to his need for serious medical interventions as a result of his severe alcohol withdrawal symptoms.

328.    Over the course of the next seven days, Individual Defendants were deliberately indifferent to Mr. Martin's obviously worsening symptoms as Mr. Martin's mental and physical

state became increasingly perilous.

329.    The Individual Defendants made intentional decisions with respect to the

conditions under which Mr. Martin was confined. They deliberately and intentionally withheld

the medical care he needed.

330.    These conditions put Mr. Martin at a substantial risk of suffering serious harm.

331.    The Individual Defendants failed to intervene and/or take reasonable available

measures to abate the serious and obvious risk to Mr. Martin. A reasonable official in the

circumstances would have appreciated the high degree of risk involved – making the

consequences of the Individual Defendants' conduct obvious.

332.    The Individual Defendants' conduct was objectively unreasonable. At all times

relevant to the allegations in this Complaint, each Individual Defendant knew of and disregarded

the excessive risks associated with Mr. Martin's serious and life-threatening medical condition.

333.    Even a layperson would have known, based upon the observable facts and

condition of Mr. Martin, that he had obvious, serious medical needs which were not being

provided. Despite this, the Individual Defendants deliberately and/or recklessly failed to ensure

that appropriate medical treatment was provided to him.

334.    With deliberate indifference to Mr. Martin's constitutional right to adequate

medical care for his known serious medical needs, as provided by the Due Process Clause of the

Fourteenth Amendment to the United States Constitution, Individual Defendants knowingly

failed to adequately and timely examine, treat, monitor, supervise, and/or obtain emergency care

for Mr. Martin's emergent medical needs, or to intervene to ameliorate the other defendants'

deliberate indifference to the obvious serious medical needs of Mr. Martin. They did so despite

their knowledge of Mr. Martin's serious medical needs, thereby placing him at risk of serious

physical harm, including death. Therefore, the Individual Defendants knew or were aware that Mr. Martin faced a substantial risk of harm and disregarded this excessive risk by failing to take measures to reduce it.

335. By not taking such measures, the Individual Defendants caused Mr. Martin's injuries and death.

336. As described with particularity above, the Entity Defendants are liable for their deliberately indifferent policies, training, practices, habits, customs, widespread usages, and failures to adequately train and supervise their employees and contractors with respect to the serious medical needs of detainees like Mr. Martin. The Entity Defendants have a widespread pattern of deliberately indifferent medical care at ACDF and, as to Defendant Wellpath, other correctional and detention facilities at which it provides medical services.

337. Defendant Adams County is directly liable for its own deliberately indifferent policies, customs, and practices that were moving forces in Mr. Martin's constitutional injury, as well as its deliberately indifferent training and supervision of nurses, its own role in setting policy regarding medical care at ACDF, and for its own ongoing toleration and/or ratification of the widespread pattern and practice of deliberate indifference to ACDF detainees' known serious medical needs.

338. Defendant Adams County is also liable under the nondelegable duty doctrine for the deliberately indifferent policies, customs, practices, training and supervision of the private companies with which it contracts to provide medical care to ACDF detainees, including Wellpath.

339. As described in detail above, the Entity Defendants' deliberately indifferent policies, customs, practices, and/or failures to adequately train and/or supervise were moving

forces in the violation of Mr. Martin's constitutional rights.

340.    The Entity Defendants were on notice that their deliberate indifference would result and had resulted in a pattern of not providing desperately needed care to inmates with serious medical needs causing injury and death.

341.    The Entity Defendants' failures in training and supervision were so obvious that the failure to provide the same was deliberately indifferent to the rights of the relevant public and a moving force in the complained of injuries and death of Mr. Martin.

342.    The Entity Defendants, through policy makers and final delegated decision-makers, ratified their employees' and subordinates' unconstitutional conduct by approving their decisions and the basis for them, including ongoing toleration of the known widespread culture of ignoring inmates' serious and known medical conditions.

343.    The ratification of the conduct that caused the death of Mr. Martin is not alleged as proof that ratification itself "caused" his death.  Rather, it evidences that the conduct that caused Mr. Martin's death was engaged in pursuant to policy, custom, and practice of the Entity Defendants; had it been *outside* of policy, disciplinary or remedial action would have been taken.

344.    Ratification of *previous* instances of deliberate indifference to medical needs, however, was a causal factor in the subsequent use of excessive force or deliberate indifference to medical needs regarding Mr. Martin, as the employees of the Entity Defendants are trained and taught that such conduct is acceptable and within policy when it happens and management takes no disciplinary and remedial action in response.

345.    Therefore, the Entity Defendants set in motion a series of events that they knew would cause a detainee in a similar situation as Mr. Martin to be deprived of his constitutional right to adequate medical care for his known serious medical needs.  But for the above acts or

omissions of the Entity Defendants, Mr. Martin would not have been subjected to a violation of his constitutional rights, and such a deprivation was a natural and foreseeable consequence of these Defendants' acts and omissions.

346.    The Entity Defendants' policies, practices, habits, customs, widespread usages, and lack of adequate training and supervision that resulted in the failure to provide proper medical care to treat Mr. Martin's known serious medical needs were not rationally related to a legitimate nonpunitive governmental purpose, or were excessive in relation to that purpose.

347.    The herein described acts or omissions of each Defendant were the moving force and the legal and proximate cause of the violation of Mr. Martin's constitutional right to receive adequate medical care for his known serious medical needs.

348.    The herein described acts or omissions of Defendants were the moving force and the legal, direct, and proximate cause of Plaintiff Estate's injuries and losses, including but not limited to Mr. Martin's death, the physical and mental pain Mr. Martin suffered before and during his death, the loss of Mr. Martin's constitutional rights, loss of enjoyment of life, and other compensatory and special damages including but not limited to permanent lost earnings and earnings capacity of Mr. Martin.

349.    The herein described acts and inactions were taken by the Individual Defendants and Entity Defendants in reckless and callous indifference to the federally protected rights of Mr. Martin, and these Defendants engaged in these actions and omissions maliciously, intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Martin's constitutionally protected rights.

350.    The intentional actions or inactions of each Defendant as described herein intentionally deprived Mr. Martin of due process and of rights, privileges, liberties, and

immunities secured by the Constitution of the United States of America and caused other

damages.

## SECOND CLAIM FOR RELIEF
### Negligence Causing Wrongful Death
### Colo. Rev. Stat. §§ 13-21-201 *et seq.*
### (By Belynn Guerrero and Terry Martin, individually, against all Defendants)

351.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

352.    At all times relevant, Wellpath was a private corporation that contracted Adams

County to provide medical care and health services to inmates at ACDF, and Wellpath is not

entitled to immunity under the Colorado Governmental Immunity Act ("CGIA").

353.    At all times relevant, Individual Medical Defendants were private individuals

employed by Wellpath and thus not entitled to immunity under the CGIA.

354.    At all times relevant, CGIA immunity was waived by Adams County and Deputy

Defendants for injuries resulting from wrongful actions by public employees in the operation of a

public jail, as described in Plaintiffs' notice of claim sent to Adams County on or about

September 27, 2022.

355.    At all times relevant, Mr. Martin was in the involuntary custody of ACDF, and

under the medical responsibility, care and treatment of Individual and Entity Defendants.

356.    The Entity Defendants and Individual Defendants had a duty to provide

reasonable medical care and treatment to detainees at ACDF, including Mr. Martin.

357.    The Individual Medical Defendants had a medical provider-patient relationship

with Mr. Martin at all relevant times and were acting within the scope of their employment

throughout the duration of that relationship.

358.    With respect to their care and treatment of Mr. Martin, the Individual Medical

Defendants owed him a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations.

359.    Deputy Defendants owed Mr. Martin a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of correctional officers in similar situations.

360.    These duties of care are informed by state law. Under Colo. Rev. Stat. § 16-3-401, "[p]ersons arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required medical treatment." The provision of adequate medical treatment and humane care is a statutory (as well as constitutional) obligation.

361.    The Individual Defendants breached their duty of care to Mr. Martin and deviated from the standard of care they owed him when Individual Medical Defendants failed to provide him with reasonably obtainable and necessary medical assessment, monitoring, care, and treatment, and Deputy Defendants failed to reasonably attempt to obtain necessary medical assessment, monitoring, care, and treatment for Mr. Martin.

362.    As a direct and proximate result of the Individual Defendants' breach of their duty to Mr. Martin, he suffered significant physical and mental pain and suffering and other damages and ultimately died.

363.    Entity Defendants are sued directly and indirectly for negligence, negligent supervision, and negligent training of staff; for failing to ensure the provision of appropriate care in the treatment of Mr. Martin; for the acts and omissions of agents and/or employees; and for the herein described acts by involved employees, agents, staff, and affiliates, who were acting within the scope and course of their employment.

364.    Entity Defendants are vicariously liable for the negligent acts and omissions by

their agents and/or employees, including, but not limited to, those named individually herein, and those directly liable for negligent failures in training, policies, and practices.

365.    Entity Defendants are directly liable for breaching their duty to exercise reasonable care in its training and supervision of its employees and agents and ACDF staff in a manner that provided ACDF detainees with reasonable medical care and treatment.

366.    Entity Defendants knew or should have known that the lack of adequate supervision and training of their employees and agents and ACDF staff was likely to harm ACDF detainees in need of medical care, like Mr. Martin.

367.    In failing to exercise reasonable care in the training and supervision of their employees and agents and ACDF staff, as it relates to their providing reasonable medical care and treatment and/or obtaining reasonable medical care and treatment for inmates, Entity Defendants negligently and proximately caused Mr. Martin's death.

368.    The negligent acts and omissions by the Defendants were a substantial and significant contributing cause of Mr. Martin's death, and it was reasonably foreseeable that these Defendants' negligence would cause the harm or a similar harm that Mr. Martin and Plaintiffs have suffered and are and will suffering.

369.    As a direct and proximate result of the conduct of Defendants, Mr. Martin suffered significant physical and mental pain and suffering and other damages, and ultimately died.

370.    As a result of these Defendants' negligence, Plaintiffs have suffered damages, losses, and injuries in an amount to be determined by the jury at trial. These damages include, but are not limited to, pain and suffering, upset, grief, loss of society and companionship, and all other purely non-economic damages as allowed under the Colorado Wrongful Death Act and

otherwise under the law.

371.    Plaintiffs suffered and continue to suffer economic and non-economic damages due to these Defendants' negligent conduct, including but not limited to economic damages for funeral expenses and financial losses due to the financial benefits they would have reasonably expected to receive from Mr. Martin had he lived, and non-economic damages for grief, loss of Mr. Martin's companionship, impairment in the quality of their lives, inconvenience, pain and suffering, and extreme emotional stress.

372.    Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which Defendants must have realized was dangerous, or that was done recklessly, without regard to the consequences to Mr. Martin and Plaintiffs.

373.    Defendants' conduct as described herein constituted a felonious killing within the meaning of Colorado law.

374.    Defendants consciously disregarded a substantial and unjustifiable risk that they knew or should have known would cause the death of another.[5]

### THIRD CLAIM FOR RELIEF
**C.R.S. § 13-21-131 – Colo. Const. Art. II, Section 20 and Colo. Const. Art. II, Section 25
Inadequate Medical and Mental Health Care and Treatment
(By Estate of Carl Martin Against Defendants Law, Hampel, Barry, Fanselow, Patton,
Skalak, Benoit, and Vassallo)[6]**

375.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

---

[5] Given the circumstances of malice and willful and wanton conduct surrounding Defendants' treatment of Mr. Martin, Plaintiffs anticipate seeking exemplary damages for Defendants' negligence once Plaintiffs have established prima facie proof of a triable issue of exemplary damages.

[6] Plaintiff brings this claim for the express purpose of establishing the scope and meaning of C.R.S. § 13-21-131, the meaning of which has not been determined by the Colorado Supreme Court.

376.    At all times relevant to the allegations in this Complaint, Deputy Defendants acted or failed to act under color of state law.

377.    Deputy Defendants are "peace officers" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

378.    At all times relevant to the allegations in this Complaint, Deputy Defendants knew of Mr. Martin's life-threatening medical condition during his detention at ACDF and symptoms thereof that indicated Mr. Martin was at significant risk of serious harm due to his condition.

379.    Deputy Defendants unreasonably failed to attempt to obtain appropriate treatment or help for Mr. Martin's serious medical condition.

380.    Deputy Defendants provided medical care, treatment, and attention below the standards required by the Colorado Constitution to Mr. Martin.

381.    In violation of Mr. Martin's constitutional right to adequate medical health care, as provided by the Due Process Clause and/or Cruel and Unusual Punishments Clause of the Colorado Constitution, Deputy Defendants unreasonably failed to attempt to obtain for Mr. Martin adequate treatment, monitoring, supervision, and/or care. They did so despite their knowledge or constructive knowledge of Mr. Martin's serious medical health needs, thereby placing him at risk of serious physical harm, including death. Therefore, Deputy Defendants knew or should have known that Mr. Martin faced a substantial risk of harm and disregarded this excessive risk by failing to take measures to reduce it.

382.    Deputy Defendants unreasonably failed to adequately meet Mr. Martin's obviously serious medical need and constitutional rights by unjustifiably failing to obtain medical treatment for him in a timely and appropriate fashion.

383.    All of the unconstitutional acts of each individual Deputy Defendant were conducted within the scope of their official duties and employment.

384.    Deputy Defendants are not entitled to qualified immunity under C.R.S. § 13-21-131 or any other statutory or common law immunities.

385.    The acts or omissions of Deputy Defendants were the legal and proximate cause of Mr. Martin's injuries and death.

386.    The acts and omissions of each individual Deputy Defendant caused Mr. Martin damages in that she suffered extreme physical and mental pain and death while he was in Defendants' custody.

387.    The intentional actions or inactions of each individual Deputy Defendant as described herein intentionally deprived Mr. Martin of due process and of rights, privileges, liberties, and immunities secured by the Constitution of Colorado, and caused Plaintiffs damages, including compensatory, economic, consequential, and special damages, along with loss of enjoyment of life, loss of companionship and association with family members, suffering, emotional distress, mental anguish, inconvenience, and loss of income.

388.    Plaintiffs are entitled to punitive damages against the individual Deputy Defendants, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Mr. Martin and/or Plaintiffs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment for the Plaintiffs and against each of the Defendants, and award them all relief as allowed by law and equity, including, but not limited to the following:

(a)    Declaratory relief and injunctive relief, as appropriate;

(b)     Economic losses on all claims allowed by law in an amount to be determined at

trial;

(c)     Compensatory and consequential damages, including, but not limited to those for

past and future losses, damages for emotional distress, loss of enjoyment of life,

funeral and related expenses, and pain and suffering on all claims allowed by law

in an amount to be determined at trial;

(d)     Punitive damages on all claims allowed by law and in an amount to be determined

at trial;

(e)     Attorneys' fees and costs associated with this action, including expert witness fees,

on all claims allowed by law;

(f)     Pre- and post-judgment interest at the highest lawful rate; and

(g)     Any further relief as justice requires and that this Court deems just and proper.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 28th day of March 2024.

*s/ Darold W. Killmer*

_____
Darold W. Killmer
Liana Orshan
Maddie Lips
KILLMER LANE, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
Phone: (303) 571-1000
dkillmer@killmerlane.com
lorshan@killmerlane.com
mlips@killmerlane.com

Kayla Foley
THE FOLEY LAW FIRM
222 East Costilla Street
Colorado Springs, CO 80903

Phone: (719) 757-1182
kb@davidfoley.net

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF REVIEW

This is to certify that undersigned counsel has conferred, pursuant to Colo. Rev. Stat.

§ 13-20-602, with a medical professional who has expertise in the areas of alleged negligence

and deliberate indifference to serious medical needs as set forth in the above Complaint; that this

professional has reviewed the known facts, including such records, documents, and other

materials relevant to the allegations of negligent acts and omissions; and they have concluded

that the filing of these claims do not lack substantial justification within the meaning of Colo.

Rev. Stat. § 13-17-102(4).


/s/ *Darold W. Killmer*
Darold W. Killmer