# United States Senate
## WASHINGTON, DC 20510

December 18, 2023

Ben Slocum
Chief Executive Officer
Wellpath
3340 Perimeter Hill Drive
Nashville, TN 37211

Sami Mnaymneh
Founder and Co-CEO
H.I.G. Capital
1450 Brickell Avenue, 31st Floor
Miami, FL 33131

Tony Tamer
Founder and Co-CEO
H.I.G. Capital
1450 Brickell Avenue, 31st Floor
Miami, FL 33131

Dear Mr. Slocum, Mr. Mnaymneh, and Mr. Tamer:

We write to express deep concern with reports that Wellpath is providing inadequate health care in prisons and jails across the United States.[1]

Wellpath is the largest prison health contractor in the country,[2] serving around 300,000 patients in at least 34 states.[3] Wellpath is owned by the private equity firm H.I.G. Capital and was created in 2018 through a merger of Correct Care Solutions (CCS) with Correctional Medical Group Companies.[4] Wellpath's predecessor CCS was named as a defendant in roughly 1,400 federal lawsuits over the decade leading up to the merger[5] — with many cases resulting in some form of

---

[1] *See, e.g.*, The Lens, "Orleans jail monitors disclose for first time issues found under Hutson's leadership," Nick Chrastil, May 16, 2023, https://thelensnola.org/2023/05/16/orleans-jail-monitors-find-falsified-records-understaffing-at-facility/; U.S. Department of Justice, Civil Rights Division, San Luis Obispo County Jail Findings Letter, August 31, 2021, https://www.justice.gov/opa/press-release/file/1429076/download?utm_medium=email&utm_source=govdelivery.

[2] U.S. Department of Justice, Civil Rights Division, San Luis Obispo County Jail Findings Letter, August 31, 2021, p. 5, https://www.justice.gov/opa/press-release/file/1429076/download?utm_medium=email&utm_source=govdelivery.

[3] The New Yorker, "The Jail Health-Care Crisis," Steve Coll, February 25, 2019, https://www.newyorker.com/magazine/2019/03/04/the-jail-health-care-crisis; Wellpath, "About Wellpath Care," https://wellpathcare.com/about/; The Atlantic, "The Private Option," Marsha McLeod, September 12, 2019, https://www.theatlantic.com/politics/archive/2019/09/private-equitys-grip-on-jail-health-care/597871/; Wellpath Statement, p. 3, https://s3.documentcloud.org/documents/6165071/Wellpath-Statements.pdf.

[4] The Atlantic, "The Private Option," Marsha McLeod, September 12, 2019, https://www.theatlantic.com/politics/archive/2019/09/private-equitys-grip-on-jail-health-care/597871/; Private Equity Stakeholder Project, "HIG Capital's and Wellpath's Correctional Healthcare Investment Risks," June 2019, p. 1, https://pestakeholder.org/wp-content/uploads/2019/06/HIG-Capitals-Correctional-Healthcare-Investment-Risks-PESP-062519.pdf.

[5] Private Equity Stakeholder Project, "HIG Capital's and Wellpath's Correctional Healthcare Investment Risks," June 2019, p. 1, https://pestakeholder.org/wp-content/uploads/2019/06/HIG-Capitals-Correctional-Healthcare-Investment-Risks-PESP-062519.pdf; Project On Government Oversight, "List of Federal Lawsuits Filed Against

compensation to plaintiffs.[6] Since its creation, Wellpath has been the target of multiple federal investigations and lawsuits, and the company has faced growing public scrutiny.[7]

A host of federal investigations, press reports, and reports by incarcerated people have revealed apparent deficiencies in Wellpath's care. Some of the most serious complaints against Wellpath include the following:

- ***Delayed care and denial of care:*** Reports indicate that Wellpath routinely fails to provide time-sensitive medical care or denies care outright. For example, a 2021 Department of Justice (DOJ) investigation into Wellpath's medical services at a California jail revealed significant delays in care and blanket denials of medical attention for incarcerated individuals scheduled to be released within weeks or months of the request for care.[8] Similarly, a Department of Homeland Security (DHS) investigation into Wellpath's predecessor CCS found that detainees lacked "timely access to proper medical care."[9] Further reports indicate that Wellpath staff have even failed to respond to urgent care needs, including for patients going into labor, seeking to terminate a 15-week pregnancy, requiring an emergency room transfer, or suffering from an emergency drug withdrawal.[10] And in some cases, incarcerated individuals have died after not receiving

---

Correct Care Solutions and Companies It Has Acquired," October 26, 2018, https://www.documentcloud.org/documents/5018937-FINAL-Master-List-of-1395-CCS-Cases-4848-9407-7557.js.

[6] Correct Care Solutions, "Medical Services – Youth Service Center," p. 12 https://s3.documentcloud.org/documents/5978594/Example-of-CCS-RFP.pdf; The New Yorker, "The Jail Health-Care Crisis," Steve Coll, February 25, 2019, https://www.newyorker.com/magazine/2019/03/04/the-jail-health-care-crisis; Prison Legal News, "Private Medical Contractor Wellpath Pays $4.5 Million in Death of Mentally Ill Jail Detainee After Judge Finds It Destroyed Evidence," Douglas Ankney, March 2021, https://www.prisonlegalnews.org/news/2021/mar/1/private-medical-contractor-wellpath-pays-45-million-death-mentally-ill-jail-detainee-after-judge-finds-it-destroyed-evidence/.

[7] Reuters, "DOJ report exposes failures of jail reform measures," Hassan Kanu, September 9, 2021, https://www.reuters.com/legal/government/doj-report-exposes-failures-jail-reform-measures-2021-09-09/; Prison Legal News, "Wellpath Founder and CEO Pleads Guilty to Federal Bribery Charges," March 1, 2022, https://www.prisonlegalnews.org/news/2022/mar/1/wellpath-founder-and-ceo-pleads-guilty-federal-bribery-charges; San Francisco Chronicle, "Its patients are 'literally a captive market.' Is this California health care giant failing them?," Susie Neilson, July 25, 2023, https://www.sfchronicle.com/california/article/wellpath-health-care-jails-17917489.php; U.S. Department of Justice, Civil Rights Divsion, "Notice Regarding Investigation ofthe Hampton Roads Regional Jail," December 19, 2018, https://s3.documentcloud.org/documents/5978540/Hampton-Roads-DOJ-report.pdf; Daily Press, "Hampton Roads Regional Jail, medical provider settle with family in wrongful death case," Peter Dujardin, November 21, 2018, https://www.dailypress.com/2018/11/21/hampton-roads-regional-jail-medical-provider-settle-with-family-in-wrongful-death-case/.

[8] U.S. Department of Justice, Civil Rights Division, San Luis Obispo County Jail Findings Letter, August 31, 2021, pp. 6, 13-14, https://www.justice.gov/opa/press-release/file/1429076/download?utm_medium=email&utm_source=govdelivery

[9] U.S. Department of Homeland Security, Office of Inspector General, "Management Alert –Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California," September 27, 2018, https://s3.documentcloud.org/documents/5978703/2018-OIG-Adelanto-Report.pdf.

[10] CNN, "CNN Investigates: 'Please help me before it's too late,'" Blake Ellis and Melanie Hicken, June 25, 2019, https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/; Declaration Of Cara E. Trapani in Support of Plaintiffs' Motion to Enforce the Settlement Agreement and Wellpath Implementation Plan at 8, Hernandez v. County of Monterey, No. 13-cv-02354 (N.D. Cal. Aug. 10, 2023); Prison Legal News, "$2.45 Million Paid by Wellpath and Macomb County, Michigan, After Detainee's Withdrawal Death in Jail," September 30, 2022, https://www.prisonlegalnews.org/news/2022/sep/30/245-million-paid-wellpath-and-macomb-county-michigan-after-detainees-withdrawal-death-jail/.

care — such as the reported case of a pretrial detainee with breathing problems who was transferred to a new jail without his CPAP machine and died after Wellpath medical staff declined to provide another one.[11] Monitors at a California jail found that 18 of the 19 deaths reviewed at the facility could have been prevented if Wellpath had followed its obligations to provide timely and adequate treatment.[12]

- *Involuntary treatment:* Wellpath has also allegedly performed procedures and administered medications without patients' informed consent and without following the company's protocol for involuntary treatment.[13] For example, at one South Carolina jail, incarcerated individuals were reportedly injected with an opioid treatment drug without their consent.[14] At another, monitors found that Wellpath staff forcibly administered psychotropic medications without following the established protocol for the involuntary administration of medication.[15]

- *Inadequate staffing:* Reports suggest that Wellpath has failed to meet contractually required staffing levels and hires under-qualified medical professionals. For example, a 2021 DOJ investigation found that Wellpath staffed an inadequate number of medical professionals at one of its facilities, putting incarcerated individuals at "substantial risk of serious harm."[16] Similarly, a 2018 DOJ investigation into Wellpath's predecessor found that incarcerated individuals were simply not sent to outside medical providers due to medical and security staffing shortages.[17] And a 2015 investigation by DOJ's Office of the Inspector General (OIG) found that a Federal Bureau of Prisons (BOP) facility in Texas that contracted with Wellpath's predecessor CCS "had significant issues staffing its health services unit."[18] In 2023, a Georgia jail feared it would be forced to cease some medical operations altogether due to serious personnel shortages in intake, medication distribution, and the main clinic.[19] Likewise, an audit at a California jail found that Wellpath provided no dental care for months because it lacked adequate dental staff, and

---

[11] Declaration of Erick Stewart at 2-4, Hernandez v. County of Monterey, No. 13-cv-02354 (N.D. Cal. Aug. 10, 2023).

[12] Plaintiffs' Notice of Motion and Motion to Enforce the Settlement Agreement and Wellpath Implementation Plan at 5, Hernandez v. County of Monterey, No. 13-cv-02354 (N.D. Cal. Aug. 10, 2023).

[13] *See, e.g.*, Order Granting Plaintiffs' Motion to Enforce Settlement Agreement and Wellpath Implementation Plan at 23, Hernandez v. County of Monterey, No. 13-cv-02354 (N.D. Cal. Sept. 26, 2023).

[14] The Post and Courier, "Charleston County continued to pay jail's medical provider millions despite pattern of neglect," Ema Rose Schumer, April 23, 2023, https://www.postandcourier.com/news/charleston-county-continued-to-pay-jails-medical-provider-millions-despite-pattern-of-neglect/article_d5680a6e-d93a-11ed-bcd7-f3f08cf76ef0.html.

[15] Declaration of Cara E. Trapani in Support of Plaintiffs' Motion to Enforce the Settlement Agreement and Wellpath Implementation Plan at 37, Hernandez v. County of Monterey, No. 13-cv-02354 (N.D. Cal. Aug. 10, 2023).

[16] U.S. Department of Justice, Civil Rights Division, San Luis Obispo County Jail Findings Letter, August 31, 2021, pp. 14-16, https://www.justice.gov/opa/press-release/file/1429076/download?utm_medium=email&utm_source=govdelivery.

[17] U.S. Department of Justice, Civil Rights Division, "Notice Regarding Investigation of the Hampton Roads Regional Jail," December 19, 2018, p. 14, https://s3.documentcloud.org/documents/5978540/Hampton-Roads-DOJ-report.pdf.

[18] U.S. Department of Justice, Office of the Inspector General, "Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas to Operate the Reeves County Detention Center I/II Pecos, Texas," April 2015, p. iii, https://www.oversight.gov/sites/default/files/oig-reports/a1515.pdf.

stopped conducting intake screenings due to a shortage of nursing staff.[20] A CNN investigation even found that Wellpath staff shredded and hid medical requests at some facilities due to a lack of available medical staff.[21] There are also reports of Wellpath employing licensed vocational nurses in roles that require registered nurses with more advanced training.[22] Monitors in Louisiana have similarly found that Wellpath has relied on under-qualified professionals, some of whom failed to follow routine medical protocols.[23]

- *Negligent care and failure to follow doctors' treatment plans:* At times, Wellpath's medical staff have allegedly provided negligent care. For example, one monitor found that Wellpath staff were not consistently looking in patients' mouths when assessing whether they needed dental care.[24] And there are numerous reports of Wellpath staff failing to provide treatment prescribed by a physician. Wellpath has canceled off-site specialist visits recommended by doctors and discontinued medications without a medical justification.[25] In one case, an incarcerated patient was apparently hospitalized due to seizures after Wellpath failed to administer her prescribed medications.[26] In another case, Wellpath discontinued a medication that an incarcerated individual had been taking for 20 years and denied his grievance simply because he raised multiple issues in the grievance at once.[27]

- *Failure to follow internal company policies:* There are also reports of Wellpath staff not following the company's own protocols. For example, at some facilities, Wellpath staff

---

[19] The Atlanta Journal Constitution, "AJC Investigation: DeKalb jail had medical staff shortages," Jeremy Redmon, June 19, 2023, https://www.ajc.com/news/ajc-investigation-dekalb-jail-had-medical-staff-shortages/7N2ZKBPT2NDX3D6M42R5HCJFKM/.

[20] Declaration of Cara E. Trapani in Support of Plaintiffs' Motion to Enforce the Settlement Agreement and Wellpath Implementation Plan at 6-7, 45, Hernandez v. County of Monterey, No. 13-cv-02354 (N.D. Cal. Aug. 10, 2023).

[21] CNN, "CNN Investigates: 'Please help me before it's too late,'" Blake Ellis and Melanie Hicken, June 25, 2019, https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/.

[22] The Lens, "Orleans jail monitors disclose for first time issues found under Hutson's leadership," Nick Chrastil, May 16, 2023, https://thelensnola.org/2023/05/16/orleans-jail-monitors-find-falsified-records-understaffing-at-facility/.

[23] Nola.com, "Lackluster care from Orleans jail health provider causes 'serious harm,' monitors say," Joseph Cranney, May 15, 2023, https://www.nola.com/news/crime_police/care-from-orleans-jail-health-provider-causes-serious-harm/article_9a3b7dca-f36d-11ed-aaa9-f7c0e64a05be.html.

[24] Declaration of Cara E. Trapani in Support of Plaintiffs' Motion to Enforce the Settlement Agreement and Wellpath Implementation Plan at 48, Hernandez v. County of Monterey, No. 13-cv-02354 (N.D. Cal. Aug. 10, 2023).

[25] Disability Law Center, "Investigation Report: Experiencing the Pandemic Inside Department of Correction Facilities – MCI-Shirley and MCI-Norfolk," March 28, 2022, p. 2, 10, 12, 16, https://www.dlc-ma.org/wp-content/uploads/2022/03/FINAL-Public-Report-C-19-DOC-Facilities-3.28.2022-1.pdf.

[26] The Post and Courier, "Charleston County continued to pay jail's medical provider millions despite pattern of neglect," Ema Rose Schumer, April 23, 2023, https://www.postandcourier.com/news/charleston-county-continued-to-pay-jails-medical-provider-millions-despite-pattern-of-neglect/article_d5680a6e-d93a-11ed-bcd7-f3f08cf76ef0.html.

[27] U.S. Department of Justice, Civil Rights Division, San Luis Obispo County Jail Findings Letter, August 31, 2021, p. 9, https://www.justice.gov/opa/press-release/file/1429076/download?utm_medium=email&utm_source=govdelivery.

4

have, in violation of company policies, reportedly failed to: perform mortality reviews; notify a physician when patients showed abnormal vital signs; develop individual treatment plans for patients with mental illnesses; and assign different staff members to review an initial grievance and an appeal.[28] Additionally, contrary to Wellpath's policies, some staff have failed to monitor for attempts at self-harm or suicide,[29] and some have even falsified logs by stating that they performed welfare checks.[30] Wellpath has also reportedly failed to abide by its own plan for implementing a court-approved settlement agreement, including failing to timely respond to sick call requests, refer incarcerated patients to outside providers as needed, or even schedule internal quality improvement meetings.[31]

- ***Inadequate mental health care and inappropriate use of restraints and solitary confinement:*** There are reports of Wellpath inappropriately responding to mental health issues by prescribing antipsychotics without clinical justification[32] and defaulting to the use of physical or chemical restraints in response to mental health crises.[33] Wellpath has allegedly also abused the use of solitary confinement for incarcerated people with mental health issues. For example, a 2020 DOJ investigation revealed that, under Wellpath, "Massachusetts' prisons subjected incarcerated people in mental health crisis to prolonged periods of restrictive housing conditions, instead of providing them constitutionally adequate mental health care and supervision."[34] Meanwhile, Wellpath has refused to give incarcerated individuals their prescribed mental health medications[35] and,

---

[28] Declaration of Cara E. Trapani in Support of Plaintiffs' Motion to Enforce the Settlement Agreement and Wellpath Implementation Plan at 7, 19, 27, Hernandez v. County of Monterey, No. 13-cv-02354 (N.D. Cal. Aug. 10, 2023); U.S. Department of Justice, Civil Rights Division, San Luis Obispo County Jail Findings Letter, August 31, 2021, p. 8, https://www.justice.gov/opa/press-release/file/1429076/download?utm_medium=email&utm_source=govdelivery.

[29] U.S. Department of Justice, Civil Rights Division, San Luis Obispo County Jail Findings Letter, August 31, 2021, p. 23, https://www.justice.gov/opa/press-release/file/1429076/download?utm_medium=email&utm_source=govdelivery.

[30] NOLA, "Lackluster Care From Orleans Jail Health Provider Causes 'Serious Harm,' Monitors Say," Joseph Cranney, May 15, 2023, https://www.nola.com/news/crime_police/care-from-orleans-jail-health-provider-causes-serious-harm/article_9a3b7dca-f36d-11ed-aaa9-f7c0e64a05be.html.

[31] Declaration of Cara E. Trapani in Support of Plaintiffs' Motion to Enforce the Settlement Agreement and Wellpath Implementation Plan at 7, 19, 27, Hernandez v. County of Monterey, No. 13-cv-02354 (N.D. Cal. Aug. 10, 2023); Order Granting Plaintiffs' Motion to Enforce Settlement Agreement and Wellpath Implementation Plan at 10-11, Hernandez v. County of Monterey, No. 13-cv-02354 (N.D. Cal. Sept. 26, 2023).

[32] U.S. Department of Justice, Civil Rights Division, San Luis Obispo County Jail Findings Letter, August 31, 2021, p. 20, https://www.justice.gov/opa/press-release/file/1429076/download?utm_medium=email&utm_source=govdelivery.

[33] Disability Law Center, "Public Report: Efficacy of Service Delivery Reforms at Bridgewater State Hospital (BSH) and Continuity of Care for BSH Persons Served," January 2022, pp. 16, 22-23, https://www.dlc-ma.org/wp-content/uploads/2022/02/DLC-BSH-January-2022-Public-Report-2.9.2022.pdf.

[34] U.S. Department of Justice, Office of Public Affairs, "Press Release: Justice Department Secures Agreement with Massachusetts Department of Correction Investigation Involving Individuals in Mental Health Crisis," December 20, 2022, https://www.justice.gov/opa/pr/justice-department-secures-agreement-massachusetts-department-correction-investigation.

[35] Private Equity Stakeholder Project, "Private Equity Firms Rebrand Prison Healthcare Companies, But Care Issues Continue," Michael Fenne, November 2022, https://pestakeholder.org/wp-content/uploads/2022/11/Wellpath_HIG_12-2022.pdf.

according to a DOJ investigation, the company "seems to discourage routine follow-up mental health care."[36]

Wellpath's payment structure incentivizes cutting costs by minimizing the number of healthcare services provided and opting to provide less resource-intensive services.[37] In its state and local contracts, Wellpath is typically paid a set rate based on the average daily population at the facilities where it provides care, with caps on the total amount that it can be compensated.[38] While some contracts increase Wellpath's compensation for emergency services such as ambulance runs or decrease compensation for failures such as not triaging sick call requests, pay generally does not increase with the volume, quality, or complexity of medical services provided.[39] Some Wellpath contracts also appear to incentivize the company to reduce the number of transfers to hospitals[40] or to employ fewer staff members.[41] Meanwhile, in at least one contract that did permit reimbursement for specific services provided, the DOJ found that Wellpath's predecessor CCS was overcharging the BOP by inflating its billing rates in invoices.[42]

---

[36] U.S. Department of Justice, Civil Rights Division, San Luis Obispo County Jail Findings Letter, August 31, 2021, p. 20, https://www.justice.gov/opa/press-release/file/1429076/download?utm_medium=email&utm_source=govdelivery.

[37] Governing, "America Has a Health-Care Crisis — in Prisons," Alan Greenblatt, July 29, 2019, https://www.governing.com/archive/gov-prison-health-care.html; NYTimes, "Prisons Cut Costs By Managed Care," Melody Petersen, December 26, 1996, https://www.nytimes.com/1996/12/26/nyregion/prisons-cut-costs-by-managed-care.html; New York University Law Review, "Mismanaged Care: Exploring The Costs And Benefits Of Private Vs. Public Healthcare In Correctional Facilities," Micaela Gelman, November 2020, p. 1404-05, 1414, https://www.nyulawreview.org/wp-content/uploads/2020/11/NYULawReview-Volume-95-Issue-5-Gelman.pdf.

[38] Wellpath, "2021 Corporate Social Responsibility Report," 2022, p. 6, https://wellpathcare.com/wp-content/uploads/2022/09/2022-09-09-Wellpath-2021-Corporate-Responsibility-Report.pdf; Contract between Alameda County Sheriff's Office and California Forensic Medical Group (now Wellpath LLC), July 2022, [On file with the Office of Senator Elizabeth Warren]; County of Santa Barbara, "Attachment A: Agreement for Services of Independent Contractor, September 12, 2023, p. 3, https://santabarbara.legistar.com/LegislationDetail.aspx?ID=6341487&GUID=1E597D78-6FD6-48F6-8B9D-E8B49147A057; County of Santa Barbara, "Attachment F: Second Amendment to Agreement for Services of Independent Contractor," August 18, 2020, p. 1, 4, https://santabarbara.legistar.com/LegislationDetail.aspx?ID=6341487&GUID=1E597D78-6FD6-48F6-8B9D-E8B49147A057; County of Monterey, "Attachment B - CFMG Agreement with Previous Board Orders," p. 45, https://monterey.legistar.com/LegislationDetail.aspx?ID=5148003&GUID=D8AD9820-4D18-43F1-93B3-9698F17D092D&Options=&Search=.

[39] *See, e.g.*, Contract Between the Department of Correction and Wellpath LLC (Formerly Known as Correct Care Solutions LLC) for Comprehensive Health Services to Massachusetts Prison Population, Nineteenth Amendment, February 2023, https://drive.google.com/file/d/1Pvn0v1KdQrX2vStQtklLuezLxkAKDg3_/view; Alameda County Sheriff's Office and California Forensic Medical Group (now Wellpath LLC), "Exhibit B: Payment Terms," July 2022, p. 55, [On file with the Office of Senator Elizabeth Warren]; County of Monterey, "Amendment No. 3 to Agreement A-13814 Between the County of Monterey and California Forensic Medical Group, Inc." (now Wellpath LLC), December 2022, p. 3, [On file with the Office of Senator Elizabeth Warren].

[40] The New Yorker, "The Jail Health-Care Crisis," Steve Coll, February 25, 2019, https://www.newyorker.com/magazine/2019/03/04/the-jail-health-care-crisis.

[41] U.S. Department of Justice, Office of Inspector General, "Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas to Operate the Reeves County Detention Center I/II Pecos, Texas," April 2015, p. 8, https://oig.justice.gov/reports/2015/a1515.pdf.

[42] U.S. Department of Justice, Office of the Inspector General, "Audit of the Federal Bureau of Prisons' Contract Awarded to Correct Care Solutions, LLC for the Federal Correctional Complex in Coleman, Florida," September 2019, p. 6-8, https://www.oversight.gov/sites/default/files/oig-reports/a1937_0.pdf.

While Wellpath asserts that its cost-cutting measures do not compromise the quality of services,[43] extensive evidence suggests otherwise.[44] Nationwide, the privatization of prison health care has been associated with instances of reduced quality of care, higher death rates, and less transparency.[45] The more recent trend of private equity firms such as H.I.G. Capital purchasing prison healthcare providers — along with food, commissary, and telecommunications providers — has supercharged the profit incentive to compromise service quality.[46]

Meanwhile, the consolidation of prison healthcare providers into fewer and fewer giant contractors has left local and state governments with few private alternatives to Wellpath.[47] Some governments have turned back to the public provision of prison health care, or to university or nonprofit providers as promising alternatives.[48]

To help the public better understand Wellpath's conduct in jails and prisons and whether the company is able to provide adequate care, we request that you provide the following information no later than January 8, 2024:

1. A list of all locations where you (or a subsidiary) operate to provide care for incarcerated or detained individuals. For each location, please provide:
   a. The number of patients you (or the subsidiary) are contracted to provide care for.
   b. The number of patients you (or the subsidiary) have provided care for during the contract period, per calendar year.
   c. The number of referrals for outside care that you (or the subsidiary) have made during each calendar year of the contract period.
   d. The total value of the contract.
   e. The pay structure for each contract.
   f. Any incentives built into the contracts, such as bonuses or increased payments based upon cost savings, staff reductions, or quality of care.
   g. Whether the federal, state, or local contracting partner receives any portion of unspent funds.

---

[43] *Id.*

[44] CNN, "CNN Investigates: 'Please help me before it's too late,'" Blake Ellis and Melanie Hicken, June 25, 2019, https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/.

[45] Reuters, "A Reuters Investigation: Dying Inside," Jason Szep, Ned Parker, Linda So, Peter Eisler And Grant Smith, October 26, 2020, https://www.reuters.com/investigates/special-report/usa-jails-privatization/; The New Yorker, "The Jail Health-Care Crisis," Steve Coll, February 25, 2019, https://www.newyorker.com/magazine/2019/03/04/the-jail-health-care-crisis.

[46] Axios, "For-profit prison services company looks to dump phone biz," Dan Primack, January 27, 2020, https://www.axios.com/2020/01/27/tkc-holdings-inmate-calling-solutions-spinoff; Private Equity Stakeholder Project, "HIG Capital's Prison Food And Commissary Store Racket," October 2019, https://pestakeholder.org/wp-content/uploads/2019/10/HIG-Capital-Prison-Food-Commissary-PESP-103019.pdf; American Federation of Teachers, "Private Prisons and Investment Risks: Part Two," 2019, https://www.aft.org/sites/default/files/media/2020/private-prisons-invest-2019-part2.pdf.

[47] New York University Law Review, "Mismanaged Care: Exploring The Costs And Benefits Of Private Vs. Public Healthcare In Correctional Facilities," Micaela Gelman, November 2020, p. 1398, 1400, https://www.nyulawreview.org/wp-content/uploads/2020/11/NYULawReview-Volume-95-Issue-5-Gelman.pdf.

[48] *Id.* at 1419-21; The New Yorker, "The Jail Health-Care Crisis," Steve Coll, February 25, 2019, https://www.newyorker.com/magazine/2019/03/04/the-jail-health-care-crisis.

2. For each contract, please provide information on required staffing levels at each facility.
    a. What percentage of the required staffing have you provided in the last 12 months? Answer by providing raw data by position/role. Please identify if any roles are filled by individuals who fill more than one role (ex: if one physician fills both an attending and a supervisory role).
    b. What percentage of your current staff positions are unfilled?
    c. In which facilities do you provide a medical doctor on site 24 hours per day (if any)?

3. When seeking a new contract, do you typically promise to cut healthcare operational costs?
    a. If so, how do you ensure the quality of care remains unchanged while cutting costs?
    b. Please provide any marketing or pitch materials provided to potential clients.

4. How do you assess the quality of care provided?
    a. Provide any internal policies used to evaluate your standard of care.

5. What protocol does Wellpath follow when providing medical screenings during the intake process?
    a. How does Wellpath screen for behavioral health issues?

6. What is the protocol Wellpath (or a subsidiary) utilizes when determining whether or not a patient should be referred for outside care?

7. How much have incarcerated individuals been charged for copays on average in your facilities over each of the past five years?
    a. Please provide this copay information for each facility where you operate and specify what portion of the copay goes to Wellpath versus the facility or agency.
    b. Have you tracked changes in the percentage of incarcerated people seeking care based on the amount of the copay charged? If so, what changes have you identified?
    c. What does the company do when an incarcerated person requires medical attention but cannot afford the copay?

8. How does the availability of security guards or scheduling of court dates affect access to health care in the facilities where you operate?

9. What role does Wellpath play in determining whether individuals should be placed in solitary confinement based on mental health conditions?
    a. Is there a status that a Wellpath provider of mental health services could assign to a patient that would result in a transfer to solitary confinement?

10. What is Wellpath's policy for identifying and treating drug or alcohol withdrawal?
    a. What training, if any, are Wellpath staff given for recognizing the symptoms of drug or alcohol withdrawal?

11. Do Wellpath staff provide medication-assisted treatment (MAT) to individuals with opioid use disorder?
    a. If MAT is provided, how do Wellpath staff ensure that the medication is administered safely and in the appropriate dosage?
    b. If MAT is provided, what is the protocol for providing counseling alongside the medication?

12. How many healthcare-related grievances have been filed in each of the facilities where you operate in each of the past five years?
    a. What have been the topics of those grievances?
    b. For each of the past five years, what percentage of grievances have been substantiated?
    c. What percentage of grievances did not receive any reply for three months or more?

13. What steps must an incarcerated person take to request non-emergency medical, mental, or dental treatment?
    a. What is the median turnaround time for Wellpath staff to process a request for non-emergency care?
    b. What is the median amount of time between a request for non-emergency care and the receipt of care from a healthcare provider?

14. What steps must an incarcerated person take to request emergency medical, mental, or dental treatment?
    a. What is the median turnaround time for Wellpath staff to process a request for emergency care?
    b. What is the median amount of time between a request for emergency care and the receipt of care from a healthcare provider?

15. List the lawsuits filed against the company over the past five years.
    a. For each, indicate the outcome of the lawsuit (settlement, dismissal, jury verdict, etc.).
    b. For all cases resulting in settlements, please indicate the dollar amount for which the case settled.
    c. Please also list each lawsuit against the company in the past five years related to miscarriages caused by medical neglect.

16. Does the company indemnify employees who are found liable for unlawful conduct committed in the course of employment, including negligence, malpractice, intentional torts, and constitutional violations?

17. How does the company decide where to allocate money in its operating budget?
    a. What are the top five line items in your budget and how much is spent on each?
    b. How has this allocation changed over the last five years? Please provide the breakdown for each of the last five years.

18. What number of staff do you currently employ, in each of the following categories: doctors, physician assistants, nurse practitioners, registered nurses, licensed practical nurses, licensed mental health professionals?
    a. What percentage of doctors are licensed to practice medicine in the state where they are working for Wellpath?
    b. What percent of doctors have lost their license to practice medicine in a state other than the one where they are working for Wellpath?
    c. What is your company's protocol for checking the licenses or other credentials of employees in each of the following categories: doctors, physician assistants, nurse practitioners, registered nurses, licensed practical nurses, licensed mental health professionals?
    d. Are there any differences between the qualifications required for doctors in your facilities and doctors operating in the local community? If so, what are the differences?

19. What types of preventative care do your medical providers offer?
    a. What process must an incarcerated person go through to access preventative care?
    b. What types of prenatal care do your medical providers offer?

20. What types of dental, mental, or medical care are your providers not permitted to perform without additional approval (if any)?
    a. What is the process of securing approval?
        i. Who must approve that care?
        ii. How long does this process take?
    b. For each type of care, what percentage of requests by providers to perform a procedure are not approved?

21. Does Wellpath participate in any voluntary accreditation system at any of its facilities? If so:
    a. Who provides the accreditation?
    b. What information do you make available to accreditors?
    c. In how many of the five most recent accreditation cycles did an accreditor do a site visit to any of your facilities?

22. What are Wellpath's internal policies for responding to deaths in custody?
    a. How many deaths have occurred in your facilities in each of the past five years?
    b. During each incident, were the company's mortality policies followed? Were the contracting agency's policies followed?
    c. Under what circumstances (if ever) is a mortality review conducted by an independent entity?

23. What are Wellpath's internal policies for responding to suicide attempts in custody?
    a. How many suicide attempts have occurred in your facilities in each of the past five years?

10

      b. During each incident, were the company's relevant policies followed? Were the contracting agency's policies followed?
      c. What is Wellpath's protocol for providing mental health care to an individual after a suicide attempt?

24. What are Wellpath's internal policies for responding to requests of pregnant and incarcerated individuals for outside appointments?
      a. What is the median length of time a pregnant individual must wait between intake and their first PCP visit?
      b. How quickly after a pregnant individual reports concerns must they be taken to the hospital?

Thank you for your attention to this important matter.

Sincerely,

_____
Elizabeth Warren
United States Senator

_____
Richard J. Durbin
United States Senator

_____
Jon Ossoff
United States Senator

_____
Edward J. Markey
United States Senator

_____
Raphael Warnock
United States Senator

_____
Laphonza Butler
United States Senator

11

_____  _____
Peter Welch                           Jeffrey A. Merkley
United States Senator                 United States Senator


_____  _____
Richard Blumenthal                    Bernard Sanders
United States Senator                 United States Senator


_____  _____
Mazie K. Hirono                       Cory A. Booker
United States Senator                 United States Senator